**Bronwen E.M. BUDDLE, Plaintiff,**

v.

**HEUBLEIN, INC., et al., Defendants.**

**No. 81 Civ. 7671(CES).**

United States District Court, S.D. New York.

April 10, 1985.

**492**

Paulette M. Owens & Associates, New York City, for plaintiff; Paulette M. Owens, New York City, of counsel.

Proskauer Rose Goetz & Mendelsohn, New York City, for defendants; Henry Kelston, New York City, of counsel.

## OPINION

STEWART, District Judge.

The amended complaint in this action alleges a Title VII claim against Heublein, Inc. and a tort claim for intentional infliction of emotional distress under New York law against defendants Berger, Holmes and Vogel. Jurisdiction of the latter is based on diversity. Other tort claims were dismissed before trial.

Trial on both causes of action concurrently were held in January. The Title VII claim was tried to the Court; the tort claim was presented to a jury. Hereinafter is set forth our findings of fact and conclusions of law as to the Title VII claim, as well as our rulings on post-trial motions by defendants attacking the verdict in plaintiff's favor.

Plaintiff was employed by defendant Heublein as a sales representative in December 1976. Heublein is engaged in the business of manufacturing, importing and selling wines and liquors in New York and elsewhere. Her duties were to promote the sales of Heublein by working with independent distributors or wholesalers of Heublein products and by calling on and servicing retail accounts, including liquor stores, restaurants and bars. She replaced another female sales representative who had resigned shortly before plaintiff was hired.

Initially, she was assigned to a training program by Harvey Bronstein, then a supervisor in the metropolitan New York area. During the month of December, she was assigned to various orientation projects in the office. In January 1977, Bronstein assigned her to be trained in the field (specifically, in Queens, her prospective territory) by Sidney Berger, an experienced sales representative. Berger is an outgoing, gregarious type who tells off-color jokes and describes himself as a "lapel-grabber". He is married and has several children. Plaintiff, on the other hand, has a much more reserved personality; on the surface, she is quiet and sometimes anxious in manner but at the same time appears to have substantial determination and ambition beneath the surface.

Plaintiff and Berger did not work well together. She resented his mannerisms and Berger became impatient with her apparent failure to appreciate his efforts to teach her appropriate sales techniques. During this portion of her training period, Berger and plaintiff customarily drove in his car to visit various customers and wholesalers, so that plaintiff could observe Berger in action using his own sales approach. Plaintiff testified that on occasion Berger engaged in sexual harassment of her by telling off-color jokes, by touching her knee and shoulder, and by trying on one or two occasions to kiss her. Although Berger denies any such conduct, we think it not unlikely that he did tell sexual jokes and that on occasion he touched her knee and shoulder, all of which plaintiff found objectionable. We do not accept her testimony that he tried to or did kiss her. Berger's conduct, to which plaintiff objects, was not in our view engaged in to sexually harass her. Rather, it appears that his behavior towards plaintiff was only a reflection of his bumptious personality.

In any event, plaintiff and Berger each complained to Bronstein about the other's conduct and in mid-February 1977, he summoned them both to his office and terminated the training relationship. Thereafter, plaintiff completed her training with other sales representatives and began to perform her duties as a sales representa-

tive.[1] Significantly, plaintiff on cross-examination admitted that she did not contend that she was sexually harassed by Berger or any other Heublein employee after February 1977. She claims, however, that thereafter in retaliation for her complaints about Berger's conduct she was subjected to various discriminatory acts. These were initiated, she contends, by Berger and also by Bronstein, who allegedly accused her of provoking Berger. Bronstein, however, denies this and he also denies that plaintiff referred to any sexual harassment by Berger in her complaint to him of Berger's training methods. Nor, in fact, does plaintiff's letter to the union (see n. 1) refer to any sexual harassment.

The alleged acts of retaliation included the following:

1. Kagel, who was in charge of distributing sales promotion material (such as T-shirts imprinted with brand advertising and the like), failed to provide her with the same amount of such material as that furnished to other sales representatives. This, she claims, adversely affected her relations with customers.

One of plaintiff's witnesses, Cogen (also a sales representative) testified in general terms that plaintiff did not receive equal treatment on promotion material. However, for a good part of plaintiff's tenure with Heublein, Cogen served an area different from that of plaintiff and so had limited opportunities to observe her performance or the actual distribution of sales material to sales representatives. Moreover, another sales representative (Daniels) who testified for plaintiff, testified that to his knowledge every sales representative had equal access to point-of-sale material and he was not aware that plaintiff had ever been denied such access. Kagel testified that he had never intentionally distributed sales material in a discriminatory manner to plaintiff; we found his testimony to be credible.

We find that the evidence does not support plaintiff's general, unparticularized claim of discrimination with respect to the distribution of promotional, point-of-sale material.

2. Plaintiff complains that Kagel borrowed bottles of liquor from one or two retailers served by plaintiff, that he thereafter failed to pay for this liquor and that as a result her relations with these retailers were damaged. Kagel testified that he borrowed wine for business purposes on a few occasions from a liquor store in Flushing and that he always reimbursed the owner of the liquor store. We accept Kagel's testimony; we fail to see here any evidence of retaliation.

3. Plaintiff complains that she was transferred from one distributor to another more often than other sales representatives and that this affected adversely her ability to develop productive customer relationships. There is, however, little or no support in the record for this complaint or that any transfers were made for discriminatory or other improper reasons. As discussed further below, plaintiff was shifted in November 1980 from the distributor Major (to whom she had been assigned in the summer of 1979) to the distributor Alpine, but this was done at the request of Major. Accordingly, we find no evidence of retaliation or discrimination to support this charge.

4. Plaintiff further complains that she was referred to by other employees, including Berger and Bronstein, in demeaning terms. Berger, she claims, told others she was a "dyke" (which the witness Daniels confirmed) and Bronstein referred to her as a "bitch". Berger and Bronstein deny that they did so. Plaintiff also complains that at a general sales meeting she was introduced as "Mr. Buddle". Kagel testified that, although he did not recall having done so, it might have happened. It was his custom in introducing sales representatives

---

**1.** In late February, plaintiff wrote a letter to the union (of which she was a member, although Berger was not), describing Berger's conduct "for the record". She did not send a copy of the letter to Bronstein or any other company official, but she did send a copy to the shop steward, a co-employee (Pl. Ex. 3).

at such a meeting to quickly go down a list of names referring to each as "Mr. So-and-So". He testified that he never intentionally referred to plaintiff as "Mr. Buddle" and we accept his testimony. We find nothing in this evidence, even assuming that plaintiff's contentions are correct, which rises to the level of discrimination or retaliation under Title VII.

Murray Vogel became vice-president in charge of the metropolitan New York area in 1978. Bronstein, who continued as plaintiff's supervisor in 1978 and early 1979, reported to Vogel. Plaintiff's performance was not satisfactory either to Bronstein or Vogel and each of them spent time with her in the office and in the field in an effort to improve her sales record. In September 1978, her performance did improve and on October 9, 1978 Vogel sent her a congratulatory note (Def. Ex. G). However, her performance fell off thereafter and in January 1979 Vogel placed her on informal probation. In a memo (Def. Ex. H) reporting this action, Vogel wrote as follows:

I met with her on January 29th and stated to her that she was not selling product, that she was not booking displays, that she was not helping with distribution or new product placement and that she evidences a genuine dislike for on premise activity. She admitted all of the above as failings and promised to do better. I told her that she was on a probationary period until June when we would reexamine her performance with all the attendant consequences. She agreed to that arrangement.

On April 1, 1979, Lloyd Holmes replaced Bronstein as plaintiff's supervisor. He had had no prior contacts with plaintiff. Holmes had requested and received a commitment from Vogel (to whom he reported) that he would evaluate and deal with the sales representatives assigned to him without regard to their prior history with the company. Holmes reported this to his sales representatives (including plaintiff) and told them that they were each starting from scratch as far as he was concerned.

Accordingly, the period of probation placed on plaintiff by Vogel was terminated.

Holmes thereafter spent some time with plaintiff in the field in an effort to improve her performance. He found that she reacted poorly to taking instructions and that she had a hostile attitude to the company's products. On occasion when he tried to give her advice, she responded with profanity. She expressed to him an unwillingness to visit "on premise" accounts (bars and restaurants) as required of sales representatives generally.

Plaintiff was assigned during 1979 as the sales representative to deal with Major, a division of the distributor Star Industries. It was her responsibility to work with Major's sales force and assist in their sales programs. Rudy Koenig, the sales manager of Major, testified that she performed poorly. As the sales representative assigned to Major, plaintiff was expected to make sales presentations at Major's sales meetings each Friday. Her presentations were ineffective; as Koenig put it, "she didn't come across". Also, she would not be available after the meetings to answer questions. Koenig offered to help her to improve her presentations but she did not take advantage of his offer. Holmes also tried to help plaintiff improve by working with her in the field, but to little or no avail.

In September 1980, Major held an outing for its staff and Vogel selected Holmes, as supervisor, and Kagel, the Smirnoff brand manager, to attend. Mrs. Kagel, a former professional entertainer who had performed at a prior Major outing, was also invited to attend. Plaintiff then wrote Vogel on September 10, asking him to explain why she had not been designated to attend (Def. Ex. F). On the following day, Vogel sent plaintiff a note asking her to meet with him to discuss the matter (Def. Ex. 1). Plaintiff did not respond until October 27 when she wrote Vogel insisting on a written explanation (Def. Ex. J). Vogel answered this on October 30 (Def. Ex. K). We find nothing discriminatory in this conduct; the fact is that Major had expressed

its dissatisfaction with her performance not long before this meeting.

In late October 1980, Koenig called Vogel and asked that plaintiff be removed as the Major sales representative. He told Vogel that she worked only infrequently with the Major salesmen, that she failed to attend regularly the Friday sales meetings, that she had not responded to Koenig's offer to help her and that she was unsatisfactory. Koenig also told Holmes that he wanted plaintiff removed. Vogel's first reaction to this was that plaintiff's employment with Heublein should be terminated; Holmes, however, asked Vogel to give her another chance and Vogel agreed. It was determined to place plaintiff on probation for three months and to reassign her to Alpine, a Peerless distributor, to which plaintiff had in the past been assigned as sales representative. Alan Paul, sales manager of Alpine, had had a good relationship with plaintiff on that prior occasion and he agreed to accept plaintiff.

When advised by Holmes of her new assignment, plaintiff at first refused to accept it. On November 5, 1980, Holmes and Vogel met with plaintiff and gave her a copy of the probation statement (Pl. Ex. 16). Plaintiff at first objected to being placed on probation, but she accepted it when Vogel told her that, if she did not accept it, she would be asked to submit her resignation.

Since Holmes was hospitalized for several weeks in January, the period of probation was extended for another month. In early March 1981, Holmes reported to Vogel that her performance had improved and plaintiff was removed from probation (Pl. Ex. 18).

In early April 1981, Vogel decided to hold on April 9 an important sales meeting, the largest ever for the Metropolitan Region, at which a formal presentation of the summer promotion program would be made to all its distributors. All of the sales representatives were instructed to be present. Plaintiff did not attend nor did she request permission to be absent. When asked by Holmes the next day why she was not present, she responded that she "had to go to school". In fact, Paul testified that plaintiff spent part of that afternoon with him, after he had advised her he could not attend the meeting. Paul also testified that plaintiff might have been more helpful to him if she had attended the meeting and then been able to report to him on the promotion program presented at the meeting.

Later the same month, plaintiff asked Holmes for 500 T-shirts to be used in promoting Smirnoff sales. Holmes regarded this as an enormously large amount, and believed that it would be illegal under New York law to use such amounts for promoting the sale of alcoholic beverages.[2] He so advised plaintiff and rejected her request. Nevertheless, she thereafter approached two other Heublein brand managers with the same request, without advising them Holmes believed her proposal was unlawful.

Also in April, two distributor salesmen (Borden of the distributor Charmer and Dorkin of the distributor Star) called Holmes to complain that plaintiff had attempted to persuade some of the retailers with whom they had established relationships to place orders for Heublein products with Alpine (a Peerless wholesaler) rather than with Charmer and Star. This is a practice called "steering" which traditionally is regarded in the industry as serious misconduct. In New York suppliers of alcoholic beverages, such as Heublein, do not sell directly to retailers but deal only with wholesalers who in turn sell to retailers. Wholesalers carry the products of the various competing suppliers and compete with each other in sales to retailers. Heublein's sales representatives, like plaintiff, are expected to work with the wholesaler to whom they are assigned in promoting the sale of Heublein products. They are also expected to call on retailers in order to promote the purchase of Heublein products

---

**2.** Cogen, a sales representative called as a witness by plaintiff testified that he customarily received 25 to 30 T-shirts, and that he never received as many as 100.

by the retailers. An increase in the sales of Heublein products by a wholesaler to whom a sales representative, like plaintiff, is assigned redounds to the benefit of the sales representative by improving his or her performance record. But for obvious reasons a sales representative should not try to persuade a retailer to switch his purchases from one wholesaler to another, and specifically to the wholesaler to whom the sales representative was assigned. If this is done, the wholesaler who loses business is all too likely to develop an unfavorable attitude to Heublein. Consequently, Heublein sales representatives are expected to leave it to the retailer to select the wholesaler with whom to deal and not to engage in steering.[3]

Vogel testified that sales representatives were admonished against steering and we accept his testimony. We find that plaintiff knew that steering was a forbidden practice.

The manager of the Charmer distributor, Borden, testified that in early April plaintiff told two of his retailers that to participate in a Smirnoff promotion they would have to order through the distributor Peerless (of which Alpine, to whom plaintiff was assigned, was a division), not as in the past from Charmer. He became very upset, and called Holmes to complain. He testified that he would have stopped doing business with Heublein if any steering took place.

Dorkin of the distributor Star testified to the same effect with respect to one of his retailers, Di Leo. Dorkin said that this was the first time it had happened to his knowledge. Di Leo also testified. Plaintiff asked him to order from Alpine, but he told her to place the order with Star. However, the order was filled by a shipment from Alpine which Di Leo refused to accept. He thereupon called Dorkin to complain, who in turn called Holmes.

After receiving the complaints from the wholesalers, Holmes confirmed them with the retailers involved. He then confronted plaintiff with these charges, which she denied. Thereafter, he recommended to Vogel that plaintiff be discharged, Vogel concurred and she was terminated on April 28, 1981. In doing so, Vogel forgot that she was entitled to two week's notice under the union contract. When this was called to his attention, he promptly corrected the error by paying her an additional two weeks' salary in lieu of notice. Although Vogel referred to her failure to attend the meeting on April 9 and her improper attempt to obtain 500 T-shirts when he told plaintiff she was being terminated, he emphasized that steering was the principal reason for his action. Both Vogel and Holmes testified that steering was the precipitating cause of her discharge; we reject plaintiff's contention that this was not even mentioned to her.

██ Based on the foregoing, we conclude that plaintiff has failed to establish by a preponderance of the evidence her claim of discrimination. Pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), plaintiff must first establish a prima facie case of sexual discrimination. If a prima facie case is established, the employer must come forward with some evidence to articulate some legitimate, non-discriminatory reason for the action. Plaintiff then has the ultimate burden to show that the "legitimating explanations put forward by the defendant for actions alleged to be discriminatory ... are mere pretexts for forbidden motivation". *Rodriguez v. Bd. of Educ. of Eastchester*, 620 F.2d 362, 367 (2d Cir.1980). Here, plaintiff timely filed her discrimination claim with EEOC on May 14, 1981, and this lawsuit was timely commenced in December 1981. Thus, plaintiff may look only to alleged acts of discrimination which occurred during the 300-day period prior to May 14, 1981, that is, the period from July 18, 1980 to May 14,

---

3. Sales representatives called by plaintiff as a witnesses, including Cogen and Spiess, con-sidered steering to be "stupid" and "unethical".

1981. Prior conduct may be used only as background evidence.

■ Prior to the assignment of Holmes as her supervisor in April 1980, although she had received assistance from her supervisor Bronstein, her performance had not been impressive. Holmes nonetheless started her on a clean slate and made continuing efforts to aid her in improving her performance. She failed, however, to satisfy Major, the distributor to whom she was assigned and pursuant to Major's demand was re-assigned to Alpine. With Holmes' help, she showed some improvement, but in April 1981 her acts of misconduct multiplied, culminating in her attempts (in an effort to improve her record) to steer business from other distributors to her distributor. This, as indicated above, resulted in her discharge.

We have serious doubts as to whether plaintiff has made out a prima facie case, but in any event defendant has demonstrated convincingly legitimate, non-discriminatory reasons for her termination, which plaintiff has failed to show were pretextual.[4] Accordingly, we dismiss the claim under Title VII.

Defendants have moved for judgment notwithstanding the verdict or, alternatively, for a new trial on the claim for intentional infliction of emotional distress. Under New York law, as set forth in *Murphy v. American Home Products Co.*, 58 N.Y.2d 293, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983), the standard is as follows:

> "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress" (§ 46, subd. [1]). Comment d to that section notes that: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Id.* at 236, 448 N.E.2d at 90, *quoting* Restatement (2d) of Torts.

In addition to the evidence reviewed above,[5] plaintiff also offered at trial the testimony of Dr. Stephen Billick, a psychiatrist who had examined plaintiff (in the office of plaintiff's attorney) in March and May 1982. He found that she had been "devastated by the events at Heublein and especially what she described as unrelenting sexual harassment" (Tr. 772). He also testified that what "was also upsetting to her was what she called a totally unexpected and unwarranted termination from employment" (Tr. 772). He diagnosed her as having a chronic post-traumatic stress disorder, which he attributed to the "sexual harassment" and the termination. He conceded that the only specific sexual harassment which she mentioned was that involving Sidney Berger in the early part of 1977. He based his conclusions on the 1977 episode and the termination in 1981, with the former being the more significant (Tr. 794–95).

Defendant also introduced the testimony of a psychiatrist, Dr. James Hannon, who examined plaintiff in his own office in July 1984. She described to him the Berger episode in 1977; she told him that she complained to her supervisor (Bronstein) about the sexual harassment by Berger and that after about three months it stopped (Tr. 821). She also mentioned the probation in the fall of 1980 and her termination in 1981. The only events which plaintiff related as having caused her stress were the Berger episode and the termination (Tr. 839). In describing to him her work history prior to Heublein, she was "extraordinarily vague" (Tr. 825). His findings were that "she was suffering essentially from a personality disorder, the

---

**4.** Holmes testified that three female sales representatives were hired in his area after plaintiff was terminated.

**5.** Ms. Spiess, called as a witness by plaintiff, was employed by Heublein as a sales representative from 1974 to February 28, 1978, when she resigned. Her testimony was not relevant to the tort claim, since it related to events prior to the statutory period. Moreover, it did not establish any discriminatory conduct as to plaintiff.

main component of which was a schizotypal personality disorder with a component of a histrionic or hysterical personality disorder present" (Tr. 831). She could be effective, however, in a structured form of employment that did not involve her in the stresses of day-to-day human relationships (Tr. 833). He also found that her personality disorder had existed at an early age, had worsened as she grew older, and was not the result of anything that happened while she was at Heublein.

Dr. Hannon also disagreed with Dr. Billick's finding of "post-traumatic stress disorder", which is defined in the standard reference manual, to which Dr. Billick referred (Tr. 799–800), as resulting from "a psychologically traumatic event that is generally outside the range of usual human experience". Such events include "floods, earthquakes, car accident with serious physical injury, airplane crashes, large fire or deliberate man-made disasters, for example, bombing, torture, death camps" (Tr. 801). Indeed, he found in the report of Dr. Reiss (Ex. 36), to whom Dr. Billick had referred plaintiff, corroboration for his own conclusions that she did not suffer from any post-traumatic stress disorder. We found much more persuasive Dr. Hannon's testimony than that of Dr. Billick.

■ In submitting the tort claim to the jury, we charged them that they might only consider events which occurred from December 8, 1978 to April 27, 1981, the day before she was terminated. We selected the earlier date, which is three years before the complaint was filed, having concluded that the New York three-year statute of limitations under N.Y.Civ.Prac.L.R. § 214(5) applied, rather than the one-year statute in N.Y.Civ.Prac.L.R. § 215 as contended by defendants. As we instructed the jury, the plaintiff could not recover any damages for intentional infliction of emotional distress flowing from her discharge. Since New York does not allow a cause of action in tort for wrongful or abusive discharge, "plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress". *Murphy v. American Home Products Corp.*, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (1983). The evidence establishes that plaintiff was an at-will employee. Consequently, the jury could not consider the Berger episode in early 1977 or the termination itself. We assume that the jury followed our instructions to this effect.

■ With respect to the verdicts finding Holmes and Vogel liable for the tort claim, we conclude that plaintiff has utterly failed to make out a case and that under the standards set forth in *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 167–68 (2d Cir.1980), the motion for judgment notwithstanding the verdict should be granted.

Holmes, plaintiff's immediate superior during all but the first three months of the period here in issue, leaned over backwards to help plaintiff. Two of plaintiff's witnesses, Cogen and Daniels, testified that Holmes was honorable, considerate and trustworthy. Vogel, Holmes' superior, relied heavily on Holmes in deciding how to deal with the disciplinary problems which plaintiff created. There was no evidence that either of them had the requisite intent or took any action which even approached the level of conduct required by *Murphy*. Rather, the evidence affirmatively establishes that they took appropriate steps to help plaintiff without success.

Moreover, the testimony of Dr. Billick is irrelevant and the jury should have been so instructed by us, since he relied solely on two episodes outside of the scope of the cause of action.

After 1977, Berger had limited contacts with plaintiff. Her evidence of his allegedly improper conduct in the relevant period is limited to the testimony of Daniels that at a sales meeting in 1980 Berger referred to plaintiff (who was not present) as a "dyke".

Daniels also related that during conversation "among the boys", he heard Berger refer to plaintiff as a "whore" and a "bitch" and advise others to "stay away from her because she'll get you in trouble".

Plaintiff was not present. Moreover, there is no evidence that these statements, if made, were delivered during the relevant period.[6]

Plaintiff did not refer to either of these events in her testimony and there is nothing in the record indicating that she was ever aware these remarks had been made or that they had any impact on her. There is no evidence, therefore, to support the verdict under the *Murphy* standards. Indeed, in our view these statements, even if made in plaintiff's presence, would not be sufficient as a matter of law to support a verdict for plaintiff. We therefore conclude that the motion for judgment notwithstanding the verdict must be granted as to defendant Berger.

Accordingly, the motions for judgment notwithstanding the verdict are granted as to defendants Berger, Holmes and Vogel. Judgment is also granted for defendant Heublein on the Title VII claim. Defendants may submit judgments.

SO ORDERED.

---

**6.** In a signed statement dated October 12, 1981 (Def. Ex. G), Daniels stated in part:

2. The distributors' meeting in April, 1981 was extremely important. That fact was made clear to all of the sales reps and in my opinion, there is no way Ms. Buddle did not know how important it was.

3. Aside from the incident described in Ms. Buddle's complaint about another employee touching her, which I heard about several years ago, I know of no other incidents of sex discrimination or sexual harassment involving Ms. Buddle.