Petra PORRAS, Plaintiff,

v.

**MONTEFIORE MEDICAL CENTER and Dr. Michael Scimeca, Defendants.**

No. 89 Civ. 4846 (RWS).

United States District Court, S.D. New York.

July 12, 1990.

Noah A. Kinigstein, New York City, for plaintiff.

Patterson, Belknap, Webb & Tyler (Jerold D. Jacobson, Fredric C. Leffler, Marc L. Sandman, of counsel), New York City, for defendants.

## OPINION

SWEET, District Judge.

Defendants Montefiore Medical Center ("Montefiore") and Dr. Michael Scimeca ("Scimeca") have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons set forth below the motion is granted with respect to the federal cause of action, and jurisdiction of the four pendent state claims is declined.

Parties

Montefiore is a voluntary, not for profit, acute care hospital with a contract with the New York City (the "City") Department of Health and Department of Corrections ("DOC") to provide medical and mental health care services to prisoners on Rikers Island.

Scimeca was hired as the Director of Mental Health at Montefiore–Rikers Island and became Porras' immediate supervisor on February 16, 1988. Scimeca is responsible for the delivery of mental health services at Rikers and supervises the performance of approximately eight Unit Chiefs, each one of whom oversees the delivery of services to inmates in a particular building. Scimeca reports directly to Charles Braslow, M.D. ("Braslow"), the Program Director at Montefiore.

Plaintiff Petra Porras ("Porras") is a 47–year old woman who commenced employment with Montefiore on or about April 22, 1985 where she was Unit Chief for Mental Health Services in building C–76 ("C–76"), the Correctional Institution For Men ("CIFM") on Rikers Island until her separation from employment on May 25, 1988. As Unit Chief for C–76 she was responsible for the delivery of mental health services for approximately 2,500 prisoners.

Prior Proceedings

On or about July 12, 1988 Porras filed a charge with the Equal Employment Opportunity Commission ("EEOC") in which she stated that she had been the subject of retaliation for refusing to side with the Montefiore administration on issues surrounding riots at Rikers Island, and further that beginning in 1987 she was intimidated and harassed. She also alleged sex and age discrimination. After an investigation, the EEOC issued a finding of no probable cause, and on June 19, 1989 Porras received her right to sue letter. On May 16, 1989 Porras filed summonses with both the Clerk of the Court for Queens and the Bronx, the respective counties of both Montefiore and the Rikers Island Clinic. Porras filed her complaint in this court on June 14, 1989 alleging five causes of action: sex discrimination under the Federal Civil Rights Act of 1964; a parallel state discriminatory cause of action under the New York State Executive Law; assault for the May 19, 1988 meeting with Scimeca; a violation of the personnel policies as to separation for cause; and a similarly pled cause of action under the employee manual for violation of the grievance procedures and other terms and conditions of employment. Montefiore's motion for summary judgment on all counts was heard on March 23, 1990 and considered fully submitted as of that date.

Porras' Employment History

Gale Siegal ("Siegal"), former Deputy Director of Mental Health Services and Dr. Robert Cohn ("Cohn"), former Program Director, interviewed Porras for the position of Unit Chief. As a nonunion, managerial employee, Porras did not have a contract of

employment with Montefiore. Several days after Porras started working at Montefiore, Porras was given a copy of Montefiore Medical Center's Personnel Policies & Procedure Manual (the "Manual").

The Manual was updated, modified and revised continually. The Forward to the Manual states that it is intended as a guide and is not meant to provide the final answer for every problem that may arise. Further, the Forward provides that the Manual should never be used as a substitute for good judgment. Porras' employment application does not contain any language which expressly limits the condition under which her employment may be terminated. Porras contends that the employee manual contained commitments to her that she would be fired only for just cause and that there would be progressive discipline and a fair and equitable grievance procedure.

As a Unit Chief, Porras worked directly under Dr. Michael Gordon ("Gordon"), a board certified psychiatrist, who was then head of the clinic. Richard Schmit, a psychiatric social worker in another building, was included among the other Unit Chiefs who worked with Porras.

Porras' hiring coincided with the first year of operation of the Montefiore program at Rikers. The clinic was reviewed as part of the conditions for Montefiore's 21 million dollar contract with the City to supply health care services. The review of the program, including Porras' house and her programs, "was nothing short of glowing." The entire program was found to be excellent, and it was held up as a national example of a mental health clinic in a prison setting.

Gordon's review of Porras after her first year indicated that Porras' performance was outstanding. Porras received an all-A rating. In his comments under summary performance Gordon stated: "Ms. Porras has done an extraordinary job in requiring for and setting up a mental health program for a difficult population in a problematic multi-faceted setting. Her dedication and her resourcefulness are a model for all

staff." Porras received a ten percent pay increase.

In or about October 1986, Porras became aware of allegations of correctional personnel brutality at Rikers Island. Many of these allegations came from the patients she served, and many allegations came as an outgrowth of the rioting that occurred on the Island in 1987. Porras spoke with Gordon and Dr. Grace ("Grace") a psychiatrist working in her unit in the fall of 1986 and indicated her sympathy and support for having the issue of brutality on the Island addressed. In October of 1986 Gordon contacted the United States Attorney's Office in the Southern District of New York to discuss the allegations of severe brutality. Schmit, also disturbed by the brutality, contacted the investigator of Rikers Island and then spoke with an AUSA. Porras allegedly at all times indicated her sympathy and willingness to testify.

In October of 1986 the Montefiore administration discovered Gordon and Schmit's testimony and reporting of brutality. Gordon was contacted and told not to assist in the investigation and that he had violated the rules and had jeopardized Montefiore's contract with the City. Siegal, his deputy, allegedly told him he could not be trusted. According to Porras, similar messages allegedly were conveyed to Porras and Schmit.

According to Porras, Porras, like Gordon, was isolated and became the victim of a barrage of harassment by Siegal and Diana Torres, the Director of Human Resources. Porras spoke to Braslow about Siegal's threats and Braslow indicated he would investigate the situation but nothing allegedly changed. Porras began to get memos concerning problems with DOC although her relationship with the DOC was previously excellent. Gordon, isolated and cognizant that his job was in jeopardy, resigned. Schmit was also allegedly threatened, harassed and told by Siegal that he was not going to be trusted. Schmit was also told by Siegal that Porras was not to be trusted that she was disloyal and that she, Siegal, was going to get Porras fired.

In early 1987 Porras alleges that she began to experience intense harassment by Siegal. Allegedly, Siegal would constantly yell at Porras, refuse to return her telephone calls and refuse to assist Porras as a Unit Chief. Siegal requested that Porras side with Montefiore on the issue of the brutality charges and when Porras refused, Siegal allegedly indicated she would "get" her. Siegal allegedly lied to Porras' subordinates to induce them to complain about Porras.

Porras alleges that Gordon was so harassed that he was forced to resign or be terminated in March of 1987 and it was exactly at this time that Porras' performance allegedly began to deteriorate. Her ratings, dropped dramatically for 1986–1987 and Porras was aware of several co-workers' complaints of her performance.

During the spring of 1987 Dr. Peter Tenore ("Tenore") and Faisal Yusseff ("Yusseff") allegedly complained to Siegal and others that Porras was uncooperative, belligerent, and unfriendly. In May of 1987 Siegal apprised Porras of these alleged performance problems. In August 1987 Siegal gave Porras a negative performance appraisal noting Porras' alleged inability to work with subordinates and colleagues. In response to the evaluation by Siegal, Porras wrote a letter. Siegal sent a memorandum to Porras' personnel file noting that Tenore and the Warden viewed Porras as abrasive and unresponsive. Porras does not allege that any of these criticisms were motivated by considerations of sex.

Porras states that the pressure from January 1987 through February 1988 continued and intensified such that Porras found herself speaking both personally and professionally with Grace, a psychiatrist who worked under her. Grace assessed Porras as suffering from tremendous emotional distress resulting from the harassment of Siegal and others creating a hostile and dangerous work environment. Siegal left Montefiore in 1987.

In February 1988 Scimeca was hired as the Director and at the first meeting between Scimeca and Porras, Scimeca allegedly threw a computer printout at Porras and in a hostile and belligerent manner demanded to know who she wanted to remove. According to Porras, Scimeca singled Porras out for an unrelenting barrage of yelling, screaming and hostility. Scimeca allegedly constantly yelled at Porras, insulted her and treated her in a demeaning and humiliating manner to which he did not subject similarly situated men. Porras alleges that these incidents occurred on an on-going and consistent basis and as a direct result of Scimeca's increased harassments, Porras allegedly began to keep a diary of some of the incidents. Porras stated in her deposition, however, that the diary first reflected a yelling session on May 18, 1988. Porras alleges that no male was screamed at or harassed in the way that Porras was harassed.

Grace states that as a direct result of Scimeca's harassment, Porras' emotional state became much worse and that Grace would meet with Porras daily to help her deal with the intensified harassment.

In or around early April 1988 Tenore, medical director for C–76 and Yusseff, Administrator for the same building, allegedly advised Scimeca that they had heard from a Physician's assistant that Porras had referred to them as "assholes" and "racists." Tenore further informed Scimeca that these characterizations were similar to ones Porras had made earlier and which were reported by another physician's assistant.

Scimeca advised Porras of Tenore's and Yusseff's complaints concerning her. He allegedly encouraged her to speak with these two and to resolve her differences. Scimeca allegedly then determined that he would meet with Porras on a weekly basis to monitor her performance. As a result of these meetings he was allegedly struck "by her singular absence of customary therapeutic and psychological skills." He also allegedly concluded that she was uncooperative and opposed to the policies he was trying to institute.

In or around April 1988 Scimeca concluded that a male Unit Chief, Schmit, was performing unsatisfactorily and thus warranted termination. Scimeca decided to

separate his employment but offered Schmit the option to resign which he accepted.

In late April 1988 Scimeca granted Porras' request to attend a conference in Montreal at the DOC's expense.

On or about May 17, 1988 a patient in C–76 attempted suicide and was nearly successful. Porras was made aware of this incident on the day it occurred. She did not report the event to Scimeca or to any other administrators. On May 18, 1988 Porras met with Scimeca and others in a regularly scheduled quality assurance meeting. Porras did not inform Scimeca of the suicide attempt. On the morning of May 19, 1988 Porras met with Scimeca in a regularly scheduled meeting. During this meeting Porras advised Scimeca for the first time that a suicide attempt, which she characterized as the worst they had, had occurred two days earlier on May 17th. Scimeca advised Porras that her failure to report this incident promptly was unacceptable.

Porras informed Scimeca that she did not report the incident to him the prior day because she had to leave to go to another meeting and that Porras had called twice on May 18 to inform Scimeca but both times she left a message without conveying any urgency or indicating that her call was other than routine. At this meeting Scimeca told Porras that she should begin to look for employment elsewhere and accused Porras of failing to report the attempted suicide to Scimeca and thus violating a rule whose existence is in dispute. Scimeca in a heated exchange, allegedly began to gesture with his hands in a wild fashion and, sitting approximately a foot or two from Porras, he attempted to get up from his chair as if to approach her but, according to Porras, did not actually leave his seat. Scimeca's hands allegedly were waving directly in front of Porras' face, and he hit a telephone on the top of his desk. Porras was terrified and, allegedly afraid of what might transpire, taped the conversation. Although Porras alleges that Scimeca screamed for fifteen to twenty minutes, the tape contains, at most, only a few minutes that could be characterized as a raised voice exchange.

Following the meeting, Scimeca conferred with Braslow and Torres, and they concurred with Scimeca's recommendation that Porras be separated from employment.

On May 24, 1988, Scimeca and Torres met with Porras and told Porras that she would have to resign or they would fire her and give her a bad reference. They offered her some time which she could use to look for a new job while still technically employed at Montefiore. Porras refused, and on May 24, 1988 she was fired with no disciplinary procedure and allegedly in violation of the hospital's policies as to separation for cause.

On May 25, 1988 Scimeca, Torres and Porras met again to discuss Porras' termination. During the course of this meeting, Porras was observed secretly tape-recording the conversation, an act which Porras admits violated the policy prohibiting employees from bringing articles such tape recorders onto the premises without permission.

On June 15, 1988 Scimeca filed a termination notice and evaluation in which he stated that Porras was the center of personnel problems and recommended that she not be rehired. Braslow conducted a hearing on the termination and sustained the termination allegedly because of Porras' overall poor record.

Summary Judgment

To grant summary judgment the court must determine that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The court's responsibility is not to resolve disputed issues of fact, *Donahue v. Windsor Lock Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987), but to determine whether there are any factual issues to be tried, while resolving ambiguities and drawing inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598,

1608–09, 26 L.Ed.2d 142 (1970)). "In assessing the inferences to be drawn from the circumstances of the [employment] termination, the court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that the firing is for a reason expressly forbidden by law." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464–65 (2d Cir.1989) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 638 (5th Cir.1985)). Nonetheless, summary judgment should be granted where no reasonable trier of fact could find in favor of the non-moving party. *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989), and to enable the court to dispose of meritless claims before becoming entrenched in a costly trial. *Donahue*, 834 F.2d at 58 (citing *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)).

In an employment discrimination case, for the non-movant to defeat a summary judgment motion it is necessary for the non-movant "to show that sufficient evidence existed in the record to support a reasonable finding of discrimination. Such evidence may be established directly by demonstrating that a discriminatory reason more likely than not motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Gibson v. American Broadcasting Co.*, 892 F.2d 1128, 1132 (2d Cir. 1989) (citing *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) and noting that "party opposing [motion] must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present.")

Elements Necessary to Establish a Prima Facie Case of Sex Discrimination

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to this compensation, terms conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (quoting 42 U.S.C. § 2000e–2(a)(1)). Porras alleges two Title VII violations—disparate treatment because of her sex and sexual harassment.

To establish a prima facie case of sex discrimination under Title VII, a female plaintiff must "show that she was treated less favorably than comparable male employees in circumstances from which a gender-based motive could be inferred." *Montana v. First Fed. S. & L. Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (citing *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 309 (2d Cir.1981); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93–94 (2d Cir. 1984)). Furthermore, to establish discriminatory treatment on the basis of sex under Title VII "proof of discriminatory motive is critical." *Zahorik*, 729 F.2d at 91 (quoting *International Brotherhood of Teamsters. v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)).

Additionally, "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor*, 477 U.S. at 66, 106 S.Ct. at 2405. For the sexually harassing conduct to be actionable it must be "sufficiently severe or pervasive" to create a hostile work environment. *Id.* at 67, 106 S.Ct. at 2405.

To prove employment discrimination under Title VII a plaintiff

"has the burden[, first,] of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

*Ramseur*, 865 F.2d at 464 (quoting *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973))). This well-known formula is equally applicable in a lawsuit alleging sexual harassment. *Christoforou v. Ryder Truck Rental, Inc.*, 668 F.Supp. 294, 302 (S.D.N.Y.1987).

**Porras has not Established a Title VII Claim**

Porras has not set forth a prima facie claim for either Title VII violation.

**1. Disparate Treatment**

■ Although Porras is female and was terminated, and despite the record, assuming Porras could establish satisfactory performance, Porras has not established that she was discriminated against on account of her sex. While Porras disputes her performance assessments rendered by Scimeca, Siegal, Tenore, Yusseff, Lau, Walker, Brown, Piccard, and the DOC, Porras has not set forth any evidence that Montefiore has retained in its employ or treated more favorably other similarly situated or comparable male managers. On the contrary, the record submitted by Porras provides substantial evidence which could lead all reasonable triers of facts to conclude that Porras' disparate treatment claim is unfounded.

Porras, through the affidavits of Schmit and Gordon, both male, submits evidence indicating that Siegal harassed all of them —Porras, Schmit, and Gordon—and indeed subjected them to similar abusive conduct. All of them were given the same opportunity to resign or be terminated. Construing all inferences in favor of Porras, Porras at best makes out a claim for retaliation on the basis of the brutality charges controversy.

Although Porras states in her deposition that she was treated differently from similarly situated males such as Schmit, Henry Deluca, and Dennis Schoen she sets forth no evidence indicating how the treatment

differed and the complaint does not identify any comparable male employees treated differently where they had comparable work records. Porras simply states that Scimeca yelled and harassed her but admitted of not knowing whether males suffered the same treatment. Porras also fails to establish that any of those managerial level employees had work records comparable to Porras' and yet remained employed by Montefiore and escaped Scimeca's yelling. Finally, Porras was replaced by a woman.

**2. Hostile Environment**

■ Porras also fails to establish a claim for sexual harassment, that is harassment not sexual in form but in circumstances from which a gender-based motive can be inferred. Although Porras claims that Scimeca and presumably Siegal yelled at and intimidated her because of her sex, there is no evidence to support her claim that the harassment in this form was gender-induced. Although various affidavits both support and negate Scimeca's alleged practice of yelling or "shrieking" at women, even assuming Scimeca's yelling at the female Unit Chiefs constituted gender-induced harassment,[1] there is no evidence presented that could support a claim that this harassment rose to a level sufficient to be considered pervasive or severe so as to create a hostile working environment.

■ For the harassment to be actionable it must be sufficiently "severe or pervasive to alter the conditions of employment". *Meritor Savings Bank v. Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405; *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) (abusive incidents few in number or duration are not actionable); *Christoforou*, 668 F.Supp. at 303 (trivial and sporadic conversation will not be actionable). *Buddle v. Heublein, Inc.*, 613 F.Supp. 491, 492 (S.D.N.Y.1985) (generally overbearing and provocative behavior of supervisor not equivalent to actionable sexual harassment). In her own deposition, Porras ad-

---

1. The affidavits do not support such a conclusion. On the contrary they contain nothing more than averments that certain employees only heard Scimeca "scream, yell or shriek" at some women and did not know of any incidents of similar behavior toward men.

mits that her diary account, allegedly triggered by the harassment, reflects only one entry of yelling by Scimeca between February and May 1988 and review of the tape she made of the May 18 meeting could lead no reasonable trier of fact to conclude the yelling, if it could be so termed, was gender rather than business-induced. Further, Porras admits not having access to and infrequent contact with Scimeca[2] and on the identified occasions the alleged yelling and intimidating conduct occurred Porras admits that it arose out of her work performance. Moreover, even considering the behavior of Siegal and Torres,[3] their alleged harassment was not limited to Porras, but by Porras' own submissions reached other persons, named males, allegedly aligned against Montefiore's interests in hushing the brutality charges and in retaining the Rikers' contract. Unfair, overbearing, or annoying treatment of an employee, standing alone, cannot constitute a Title VII sex discrimination claim. *See Christoforou*, 668 F.Supp. at 303.

Even assuming the inadmissable hearsay allegations contained in the affidavits submitted on Porras' behalf, there is no sufficient evidentiary basis on which a trier of fact could conclude that the level of harassment was gender-induced and such that it could be characterized as pervasive or severe. The cases Porras cites to sustain her claim are readily distinguishable from the facts presented in the case at bar. *See e.g., Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010, 1014–15 (8th Cir.1988) (women subject to "a plethora of offensive incidents ... no less compelling than other cases" cited describing egregious sexual slurs, insults, and obscenities sufficiently pervasive or severe to constitute a Title VII violation).

Although Porras raises several facts in dispute, few are material to the Title VII claim and of those relevant to the Title VII claim, when drawing all inferences in favor of Porras as required, no reasonable trier of fact could conclude that Porras has set forth the necessary facts to undergird either type of Title VII violation. Accordingly, defendants are granted summary judgment on the Title VII claim.

Pendent Jurisdiction

In general, federal courts should abstain from exercising jurisdiction over pendent state law claims once they have dismissed the federal claims, unless retaining jurisdiction to determine pendent claims is warranted by "consideration of judicial economy, convenience and fairness to litigants." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1976); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). As the Second Circuit recently stated: "although the doctrine of pendent jurisdiction is one of flexibility and discretion, it is fundamental that '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'" *Young v. New York City Transit Auth.*, 903 F.2d 146 (2d Cir. 1990) (quoting *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted)).

Porras' complaint states one federal cause of action and four pendent state law claims. In view of the disposition of the federal claim and in a weighing of the traditional considerations of judicial economy, convenience, fairness and comity, the exercise of jurisdiction over the pendent claims involving the alleged assault, state discrimination claim, and the alleged violations of the Montefiore manual is declined. *Baylis v. Marriott Corp.*, 843 F.2d 658, 664–65 (2d Cir.1988) ("The basis for retaining jurisdiction is weak when, as is the case

---

**2.** Porras states that she met with Scimeca in the period February through May 1988 a total of six or seven times. Grace's affidavit, if read consistent with Porras' statements, states that Scimeca's yelling was part of the harassment. By Porras' admission, Scimeca's "yelling" could not constitute the "daily" and "constant" harassment Grace alleges Porras suffered and Porras' Title VII claim according to her own deposition testimony rests on Scimeca's treatment of her.

**3.** In her deposition Porras states that the only reason she filed suit was because Scimeca was threatening her.

here, the federal claims are dismissed before trial."). *See also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7 (1988) (when "all federal—law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims").

Accordingly, the pendent claims are dismissed.

Conclusion

For the reasons set forth above, Montefiore's motion is granted in part and this case is dismissed.

It is so ordered.