Michael Anthony CREWS, Plaintiff,

v.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, Defendant.

No. 03 Civ. 8096(RWS).

United States District Court, S.D. New York.

Sept. 29, 2006.

Vincent I. Eke-Nweke, Brooklyn, NY, for Plaintiff.

Schoeman, Updike & Kaufman by Laura D. Barbieri, of counsel, New York, NY, for Defendant.

*OPINION*

SWEET, District Judge.

The defendant The Trustees of Columbia University in the City of New York ("Columbia" or the "Defendant") has moved for summary judgment pursuant to Rule 56(e) of the Federal Rules of Civil Procedure to dismiss the complaint of plaintiff Michael Crews ("Crews" or the "Plaintiff") alleging discrimination and retaliation. For the reasons set forth below, the motion is granted.

***Prior Proceedings***

Crews is an incarcerated male and formerly the Manager of Operations, Morningside Campus, Department of Security (the "Department") at Columbia. His employment was terminated on May 14, 2002 after he admitted stealing $960.00 from Columbia's parking receipts.

Columbia is a world-renowned academic and research institution with four campuses, two of which are in New York City: the Morningside Heights ("Morningside") campus and the Washington Heights campus, then known as the Health Sciences ("HS") campus. The Department, now known as the Department of Public Safety,

strives to provide a safe environment for Columbia's over 36,000 students, faculty, and employees, as well as its visitors.

On September 23, 2002, Crews filed a charge with the New York State Division of Human Rights ("NYSDHR"), alleging discrimination and retaliation on the basis of gender. For dual-filing purposes, the charge also was filed with the Equal Employment Opportunity Commission ("EEOC"). On July 14, 2003, the EEOC issued a right to sue notice.

On October 14, 2003, Crews filed a complaint claiming violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–101 *et seq.* The complaint alleged that Columbia (1) terminated his employment on the basis of his gender and in retaliation for his complaining about gender discrimination; (2) discriminated against him when, on two occasions, it did not promote him to the position of Assistant Director at the HS campus; and (3) retaliated against him after he complained about discrimination by subjecting him to disparate treatment, including reducing his responsibilities and undermining his authority.

After discovery, Columbia filed the instant motion which was marked fully submitted on May 17, 2006.

***The Facts***

The facts are set forth in the Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 of Columbia and the Statement of Disputed Material Facts Pursuant to Local Rule 56. 1(b) of Crews. The principal facts are not disputed except as noted below.

Within Columbia's administrative departments is the Department of Public Safety, previously known as the Department of Security. The Department strives to make Columbia a safe community, for its students, faculty, staff and visitors. This responsibility extends to all Columbia's campuses, including the Morningside campus and the Washington Heights campus, then known as the Health Sciences ("HS") campus. The Department is organized in its lower ranks similarly to a police department with officers, sergeants, lieutenants, and captains (in ascending order of rank). The Department maintains around-the-clock security, generally in three eight-hour shifts. Its senior management includes Senior Investigators, Assistant Managers, Managers, Assistant Directors, Associate Directors, Directors and an Assistant Vice President. Currently, of the fourteen managers, two are women, one at the associate director level, Jeannine Jennette ("Jennette"), and the other at the manager level, Elizabeth Compel ("Compel"). Jennette is the Associate Director of Operations at the Medical Center.

George Smartt ("Smartt") was employed by Columbia from January 1985 until July 2002, when he retired. He rose through the ranks of the Department obtaining the position of Director of the Department. He later was promoted to the position of Assistant Vice President. Smartt's duties and responsibilities included "the overall administration of the department of security at all of its campuses."

James Conlon ("Conlon") was hired by Columbia in 1974 and has worked in the Department since 1975. He advanced through the ranks of the Department and was promoted to the position of Associate Director in 1994. In 2002, he was promoted to the position of Director of Administration and Finance, the position he now holds. When he was Associate Director, his duties and responsibilities included the day-to-day operations of the HS campus and responsibility for the budget for the

Department. Conlon also supervised the Department's crime, training, and electronic security functions.

Kenneth Finnegan ("Finnegan") was hired by Columbia in 1994. He briefly held the position of operations manager for the Morningside campus and then was promoted to the position of Assistant Director for Morningside Operations in August of 1994. In January 2000, he became the Assistant Director for Investigations. In February 2004, he was promoted to Director of Investigations and Technology, the position he currently holds.

John Murolo ("Murolo") was hired by Columbia in January 2000 as the Assistant Director of Operations for the Morningside campus. In July 2004 he was promoted to Director of Operations for Morningside area of Public Safety, the position he currently holds.

In the time period relevant to the complaint, the Department had been without a female at the director level since 1994. The Department had only one woman manager, Compel, who was employed as the Department's Training Manager. She was the only woman above the rank of lieutenant. In its lower ranks, there were no captains, one woman lieutenant out of six, and four women sergeants out of fifteen. The one woman lieutenant intended to and did retire by the end of 2000.

Crews commenced his employment with Columbia in 1989 as a sergeant in the Department. (Compl.¶ 10). His duties as a sergeant included patrolling the interior and exterior of the Morningside campus from 110th Street to 125th Street, and supervising approximately thirty-five security personnel and nine student aids. (Crews Tr. 22–23).

In 1991, Crews was promoted to lieutenant. As a lieutenant, Crews was responsible for various office duties and the supervision of sergeants and officers. In 1993, Crews was promoted to captain. As a captain, Crews was the supervisor of his shift and all its personnel and was also responsible for investigating complaints.

In 1994, Smartt promoted Crews to Manager of Operations for the Morningside campus. Both Conlon and Finnegan supported his promotion to this position. Crews held this title until May 14, 2002 when his employment was terminated after he admitted stealing money over a period of time from Columbia.

Crews' duties and responsibilities as Operations Manager included day-to-day supervisory responsibilities for personnel at Morningside, responsibility for a $2,000 petty cash fund, and other varied tasks. Most of his investigative experience involved burglaries and thefts of property. Crews worked from Morningside but had responsibilities also at the HS campus. He spent at least one day a week at HS.

As Operations Manager, Crews' responsibility for his $2,000 petty cash allotment included maintaining, disbursing and reconciling the fund. When a Department member needed money, he or she would complete a voucher. Crews would review the voucher, maintain receipts with the voucher, and dispense the funds requested as appropriate. Crews was the only person who could dispense money from this petty cash fund. He secured the petty cash, vouchers and receipts in a locked petty cash box to which he had the only key.

When the funds were depleted, Crews reconciled the petty cash disbursements by totaling the vouchers and receipts against the remaining money, if any. He completed a petty cash request form attaching the reconciliation vouchers and receipts, and replenished the petty cash fund at the cashier's office.

Finnegan, while he held the position of Assistant Director of Operations, was Crews' direct supervisor from 1994 until 2000. In 2000, when Murolo was hired as the Assistant Director of Operations, Morningside, he became Crews' direct supervisor. Conlon, as Associate Director, directly supervised many of Crews' responsibilities as well.

Until the time of his admitted theft, Crews was believed to have performed his job very well. From time to time, though, he received criticism from his supervisors regarding his work performance. According to Columbia, on multiple occasions Crews was told that his time management skills were problematic, that he needed to be more attentive to his paperwork, and he was advised, on multiple occasions, that in order to advance within the Department he needed to address these work performance concerns, as well as obtain his college diploma.

According to Crews, no such criticisms or concerns were expressed to him except that in December 2001, during his second interview for the position of Assistant Director Operations at HS campus, Conlon referred to poor time management and lack of college diploma as a pretext to deny Crews' application for promotion. Conlon testified that he never told Crews that he was not qualified for the position of Assistant Director.

Crews did not have a college degree and did not pursue any educational opportunities to obtain a college degree while he worked for Columbia. Crews has noted that Finnegan and Lynch received promotions and did not have college degrees and that he attended training courses or conferences. Crews received raises every year or almost every year which were approved by Smartt based on the evaluation and recommendation of Conlon and his other supervisors.

In 2000, Franz Crook, the Operations Manager for the HS campus and Crews' counterpart, retired. When that occurred, there was no manager physically present on a full-time basis at the HS campus. At about the same time, Smartt decided to hire an Assistant Director dedicated to the HS campus. Up to this point, Smartt, Conlon, Finnegan and Murolo had traveled back and forth to the HS campus as needed to service the security needs of the HS campus.

According to Columbia, Smartt believed that the needs of the HS campus had increased sufficiently to warrant managerial presence at a higher level, such as a dedicated director who would work from that campus. He considered it desirable to have a higher-ranking member of the Department assigned to that campus to signal to the HS community that its security needs were given appropriate managerial oversight and attention. This also would have the practical effect of reducing the need for both him and Conlon to attend to certain day-to-day needs of that campus and would allow them to exercise more oversight responsibility for the security needs of the University overall. Articulating this concern, Smartt advised Conlon that he did not want Conlon "stretched too thin" between the campuses. Smartt also wanted the person selected to have significant law enforcement and administrative experience sufficient to handle the job responsibilities at one of Columbia's major campuses, and to have sufficient stature in the law enforcement community to command the respect of those working, studying and visiting the HS campus. The "Position Announcement" included the job description and qualifications required. The job description included both operations functions as well as certain director functions, similar to those performed by Crews' counterpart,

Murolo, at Morningside. According to Crews, Smartt's statements regarding his hiring goals are self-serving and without basis.

Smartt commenced the process for recruiting and hiring a qualified person for this position. The hiring process typically includes a number of steps: creating or revising a job description (the requirements for a position are determined by the Department in consultation with Columbia's Human Resources Department); "posting" [1] the position on Columbia's website; at times, advertising the position in local or national publications; recruiting by "word of mouth"; reviewing the resumes received; interviewing qualified candidates; selecting a candidate; obtaining approval of the selection by the monitoring committee; and extending the offer of employment to the selected and approved candidate. Crews has contended that this process was not implemented.

The Assistant Director position was posted in early 2001. The position was reposted on June 27, 2001 because the posting period (six months) had expired without the position being filled. Before a candidate may be selected for a position, the job must be posted for a minimum of one week. Crews has contended the position was not posted.

Between March and June 2001, four applicants were interviewed for the Assistant Director position; all were women. Conlon and Finnegan interviewed all four women. Most of the applicants also spoke with Smartt, though he did not actually interview the candidates. Male candidates also inquired about the available position. There is no evidence that they were denied the opportunity to apply or were rejected because they were male.

In December 2000, Crews assumed managerial responsibility for the HS campus. Although Crews was the Operations Manager for the Morningside campus, he was familiar with the duties of the Assistant Director position and the HS campus itself. Other than Crews, Compel was the Department's only other manager, but Crews was more familiar with the duties and responsibilities of the Assistant Director position. According to Crews, he applied for the Assistant Director position but was rejected because Columbia wanted the position to be filled by a female.

Crews was not promoted as a result of his duties at HS. During the assignment period, his title did not change and he continued to report to Murolo, the Assistant Director of Operations, Morningside. He received additional compensation "for having to go back and forth," and a salary increase. Crews testified as follows:

> Q: So you said that Mr. Crook left and there was another operations manager who took over the Health Sciences Campus for a short period of time, is that correct?
>
> A: Correct.
>
> Q: Then this operations manager, whose name you can't recall, left?
>
> A: Correct.
>
> Q: Then you took over both campuses as operations manager, is that correct?
>
> A: Initially, yes.

MC–45:17–46:1.

> Q: What were your duties and responsibilities?

1. Posting means adding the position to the jobs available listing on Columbia's website as well as physically posting the job availability notice at various places throughout the University. The posting includes the job description, minimum and preferred qualifications, the grade level, and, at times, the salary. Columbia's website is accessible to all Columbia employees and to the public through the Internet.

A: To attend all meetings that required the presence of either George Smartt or Jim, actually James Conlon, to deal with the attendance program, attendance and tardy programs that we had set up, to deal with the petit cash, to supervise. I was on a couple of committees. My duties would have been the same as the duties downtown.

Q: By the duties downtown you mean your duties as the manager of security operations?

A: Correct.

MC-48:14-23.

Q: You stated that the operations manager who was there for a short period of time left and that was the reason that you were shifted to the Health Sciences Campus, is that correct?

A: That's my belief, yes.

Q: You were told to go to the Health Sciences Campus by George Smartt, is that correct?

A: Correct.

Q: Who was your supervisor at that time?

A: I'm trying to recall, was John Murolo in place, I think he was, John Murolo.

Q: He joined the department at approximately January at that time?

A: I believe so, yes.

MC-49:18-50:6.

Crews also continued as operations manager for Morningside. He worked at the HS campus in the morning and then traveled to the Morningside campus in the afternoon. He often worked past 5:00 p.m. because of the demands of managing the operations at both campuses. While Crews was assigned to the HS campus, according to Columbia, Smartt, Conlon and the other directors continued to perform the same duties and responsibilities at HS as they had prior to Crook's retirement. According to Crews, Conlon spent his time at the HS campus and Murolo testified that Crews performed the majority of the duties of the Assistant Director at HS campus.

In June 2001, after an 18-month hiring process, Smartt hired Creola Griffin ("Griffin") for the position of Assistant Director, HS campus from the qualified candidates who applied and remained interested in the position. Crews has challenged the duration of the process, denied the posting of the position and stated that only females were interviewed.

On July 2, 2001, the Applicant Post Report was sent to the Monitoring Committee for approval. Both Human Resources and Columbia's Monitoring Committee approved Smartt's hiring decision. As a general matter, Columbia's Human Resources Department reviews the candidate selected to ensure that he or she meets the minimum qualifications for the position. The Monitoring Committee reviews the selection process to determine whether it conforms to the University's Equal Employment & Affirmative Action policies and goals. At the time of this selection, Smartt was a member of the Monitoring Committee and was familiar with these University policies.

Columbia's equal employment and affirmative action policies require that departments hiring for positions in grade 14 and above (the position of Assistant Director was a grade 14 position) intensively recruit candidates from under-represented groups. The intensive recruitment process is intended to promote the potential for diversity by attempting to attract as many qualified women and minority applicants as possible to the extent they may be under-represented in the department.

Crews has challenged that a search plan was developed for the position.

Smartt believed that women particularly and minorities generally were under-represented in the Department and that the Department and the University overall would be better served by becoming more diverse, particularly given that there were no women above the rank of lieutenant, and he was the only African–American senior manager in the Department. Smartt also believed that diversity added value to the management of the Department. The University is ethnically and culturally diverse, as are its surrounding neighborhoods. The Department services this entire community. It was important to Smartt, to the extent possible, to represent that diversity within the Department. According to Crews, the allegations concerning Smartt's beliefs are conclusory and self-serving.

Smartt did not instruct, direct or require the directors to interview only women or to recommend only women for the position. Smartt stated that it was not his management style to dictate to his subordinates. He expected them to exercise professional judgment. He further expected that they would recommend the most qualified person for the job regardless of gender or minority status. Smartt testified as follows:

Q: Did the security department intend to fill the position with a female candidate?

A: We had hopes.

Q: What do you mean by "we had hopes"?

A: I felt that our department could be best served by being more diverse.

Q: More diverse in what respects?

A: In that we had no women above the rank of lieutenant, and that person was retiring that year.

Q: Who was that person?

A: Margaret Kahn.

Q: Did you then decide that the position of assistant director at the Health Sciences Campus should be filled by a female candidate?

A: I expressed that I hoped that they could recruit a female for an assistant director position.

Q: Who did you express this, what I call, sentiment to?

A: The persons who were going to do the interviews.

Q: Who were these persons?

A: Assistant directors and Jim Conlon.

Q: Would this be Mr. Finnegan and Mr. Murolo.

A: That's correct.

Q: All these individuals were your subordinates; is that correct?

A: Yes.

Q: Is it fair to say you gave them a directive, that the position should be filled by a female candidate?

A: That is not my management style.

Q: What is not your management style?

A: That I gave them a directive.

Q: So how would you characterize whatever indication you gave to them with respect to filling the position of assistant director at the Health Sciences Campus in about the year of 2000 with a female candidate?

A: I informed them that I would like their search to include qualified female candidates.

S–27:25–29:23.

Q: Did you in any way indicate to the individuals who participated in the interview process that there was a

need to fill the position with a female candidate?

A: Did you say need?

Q: Yes, I said need.

A: No.

Q: Did you express any sentiment that the position should be filled by a female candidate?

A: Yes.

Q: What specifically did you do in that respect?

A: I informed the directors who were going to make the initial interviews and review that I still had a desire to have our department become more diverse.

Q: When you say you had a desire for your department to become diverse, you mean that you wanted the position to be filled by a female candidate?

A: That is not correct.

Q: How would you characterize the desire that you conveyed to these individuals?

A: The desire to have it filled by a female was something that I wanted them to use in their criteria for selection, but at the same time I wanted them to make sure that we wanted them to get the most qualified person for the position.

S–41:5–42:13.

Finnegan testified that he had a conversation with Smartt during which Smartt asked him to identify female applicants who were qualified for the position of Assistant Director but did not recall if Smartt asked him to identify male applicants for the position. (F. Tr. 19–21). Crews has contended that Conlon actively solicited only females for the position. (C Tr. 67, 161–63). According to Crews, the Applicant Pool Report stated that Smartt and Murolo interviewed each of the four females.

Conlon, Finnegan and Murolo testified that they did not select candidates based on gender or any other minority status. Further, they testified they were never told by Smartt or anyone else that they were required to hire a woman. They were aware that the University sought qualified applicants including women and minorities, discussed qualified candidates, including females, and were asked to identify qualified female candidates for intensive recruitment.

According to Columbia, Griffin was hired because she was the most qualified of the remaining applicants. Her qualifications included both college and masters degrees in public administration. She spent more than twenty years as a member of the New York City Police Department ("NYPD"), retiring as a Lieutenant, and had demonstrated administrative skills, communications skills, budget experience, training experience, and community involvement. Prior to her retirement, she was assigned to the Deputy Commissioner of Community Affairs, Inspections Unit, Bias and Intelligence Division. Griffin started working at Columbia on July 27, 2001. After Griffin was hired, Crews remained at the HS campus to help her become familiar with the campus and its operations. Thereafter, Crews returned full time to his position as Operations Manager *for Morningside only*. Conlon also assisted Griffin in becoming familiar with her role, duties and responsibilities as the Assistant Director of HS. Conlon described her training as an ongoing process until she resigned. He testified that as a result of her hire, he spent less time at HS. According to Crews, these allegations are irrelevant and immaterial.

Crews has asserted that he applied for the position of Assistant Director [2] and had ongoing conversations with his supervisors over the years regarding his desire to advance within the Department.

According to Columbia, Smartt did not consider Crews qualified for the job because he lacked certain of the minimum requirements, such as a college education, sufficient administrative and time management skills. Also, Smartt wanted the person he hired to have sufficient stature in the law enforcement community so that members of the Columbia community would respect his choice of Assistant Director and so that the Assistant Director would be able to interact effectively with the NYPD. Smartt, Finnegan and Murolo were all former veterans of the NYPD. Smartt did not believe that Crews' position as Operations Manager had enough visibility within the Department for Smartt to achieve these objectives. Crews has challenged Smartt's testimony and noted that Finnegan and Lynch did not have college degrees and that he had received excellent work performance evaluations.

Crews was not interviewed for the position. According to Columbia, the University and the Department specifically have no obligation to interview applicants who are not qualified. Senior management, each of whom had worked with Crews, were aware that he had difficulty at times setting priorities and getting his paperwork done. Although these deficiencies did not change their views that as operations manager Crews performed his job very well, they expected employees at the Assistant Director level to have excellent communication and writing skills, excellent administrative skills, and demonstrate success in each of these areas. According to Crews, he was interviewed by Conlon and was told by Conlon he was qualified for the position.

As compared with Crews, Griffin had greater administrative experience, law enforcement experience, supervisory experience, education and stature within the law enforcement community, allegations which Crews contends are irrelevant and immaterial. Crews testified that he was not more qualified for the position than Griffin and acknowledged that Griffin had a college degree, a graduate degree and more law enforcement experience than he did and that he had no knowledge of whether Griffin had more supervisory experience or more investigative experience than he.

According to Columbia, Crews' gender played no role whatsoever in Smartt's determination that Crews was not qualified for the position, and Griffin was hired because she was the most qualified of the remaining applicants, not because she was a black woman.

In December 2001, Griffin resigned from the position of Assistant Director and the search process for Griffin's replacement began. While the search process was ongoing, Crews was transferred back to the HS campus to work again from that location as well as from Morningside. As before, he started his workday at the HS campus and traveled to the Morningside campus in the afternoon and performed his duties as the Operations Manager at both campuses. Smartt, Conlon and the other directors resumed the duties they previously performed prior to Griffin's hire. When Crews was transferred back to the HS campus Smartt designated him the Acting Assistant Director.

According to Columbia, Crews' transfer was not a "promotion" but a temporary assignment while the Department sought a replacement for Griffin. Crews' title did

2. For the purposes of this motion only, Columbia does not dispute this assertion.

not officially change, his duties did not change, and his supervisor did not change. As before, he received increased compensation.

When Crews returned to the HS campus he became responsible for the security safe which secured parking revenues, parking vouchers, and student identification card payments. At HS, people paid for parking in various Columbia garages. Parking revenues were received by security officers, logged in the parking logbook with the officers' name and permit voucher number, and the money was placed in an envelope, sealed and dropped into a slot in the safe. When the safe became filled with parking receipt envelopes, Crews was responsible for removing the sealed envelopes to the Office of Institutional Real Estate, the department responsible for recording the parking revenues for Columbia garages.

Crews' transfer to HS the second time strained security operations at Morningside. Murolo, his supervisor, was under pressure to improve security, post–9/11, and Crews' absence was a cause of tension between Conlon and Murolo. After several discussions, including e-mail exchanges, Murolo convinced Conlon to return Crews full time to the Morningside campus.

According to Crews, during the Annual Police and Security luncheon, held in February 2002, Compel, then the Department's Training Manager, informed him that Conlon had notified her that effective Monday, March 4, 2002, she would be replacing Crews as the Acting Assistant Director at the HS campus. Crews also contends that in late February 2002, Conlon telephoned Crews' home and informed him that Compel would be replacing him as Acting Assistant Director at the HS campus, that he would be required to train Compel as he did with Griffin, and that Crews had known all along that the University was still insisting that the position be filled by a female.

According to Crews, on Monday, March 4, 2002, he complained to Smartt and also to Conlon that the decision to replace him with Compel was discriminatory on the basis of gender. He claims that Smartt told him that everything would be okay and that he was under a lot of pressure from the University to replace Crews with a female. Crews has asserted that Murolo *did not* request that he be returned or reassigned solely to the Morningside campus and that the e-mail on which Columbia has relied was generated as a result of poor performance write-ups issued by Conlon to Murolo.

According to Columbia, in March 2002, since Griffin's replacement had yet to be determined, and Crews was needed at Morningside, Conlon transferred Compel to HS to continue a managerial presence at HS. Compel was the only other manager in the Department. Compel's transfer to the HS campus was temporary as well. When Crews returned to Morningside, Murolo explained that Crews was needed to help prepare for commencement and, in substance, that he was being spread too thin between the two campuses and that Murolo needed him to return to Morningside full time. Crews has asserted these allegations are argument and self-serving.

Crews has alleged he complained to his supervisors that women were getting promoted "over" him. He has admitted that he was aware that Columbia offered multiple internal grievance processes for its employees to complain about alleged gender discrimination including its Human Resources Department, its Omsbud, and its Equal Employment Opportunity and Affirmative Action office, and that he failed to complain at any time to these departments concerning his allegations.

According to Columbia, Compel was not "promoted" when she was transferred to HS. Her official title did not change though she too was designated as Acting Assistant Director and the purpose for giving Compel this title was to provide the HS campus community with a manager on campus while Griffin's replacement was sought, and to reassure the Columbia community that there was someone with managerial authority on campus who would assist them with their security needs and that gender was not a reason for the transfers. According to Crews, these allegations are argument and self-serving.

Compel also applied for the position of the Assistant Director, but she was not hired because she did not have sufficient qualifications for the position. After the new Assistant Director was hired in July 2002, Compel returned to her position as Training Manager full time. According to Crews these allegations are argument and self-serving.

Crews has claimed that he "reapplied" for the position after Griffin resigned.[3] When asked to explain what he meant, Crews testified, "after Creola Griffin left there was a void. I was asked if I could go back uptown by George Smartt. I was supposed to share some time there."

Smartt did not hire Crews to replace Creola Griffin for the same reasons he did not hire him when the Assistant Director position was originally created. Smartt's opinion regarding Crews' qualifications for the position had not changed. The issues with respect to Crews' job performance had not improved such that he was a viable candidate for the job. At no time did any of Crews' supervisors tell him that he was qualified for the position or that he would be considered. None recommended him for the position. Crews did not ask any of the directors to recommend him for the position to Smartt. According to Crews, these allegations are argument and self-serving.

A comparison of the credentials of the candidates interviewed demonstrates that the minimum qualifications for the position were applied consistently with respect to each applicant interviewed. Each applicant interviewed had a college degree, and in most instances, a graduate degree. Most candidates were members or former members of the New York City Police Department with more than twenty years experience in law enforcement. All were experienced administrators, almost all having had budget responsibilities and extensive supervisory experience. According to Crews, these allegations are self-serving and immaterial.

Crews admitted that he did not know the qualifications of the person who was hired to replace Griffin and that he was not in a position to determine who was or was not qualified for the position.

When Compel was transferred to the HS campus, allowing Crews to return to the Morningside campus, she discovered that funds were missing when she attempted to reconcile the parking envelopes and vouchers with the parking logbook. After determining that monies as well as vouchers were missing, she advised Conlon of the problem.

On March 26, 2002, Conlon met with Karen Fry ("Fry"), Assistant Vice President, Department of Institutional Real Estate, who independently ascertained that the parking revenue receipts and vouchers did not reconcile. As a result of the meeting, new security controls were established between the two departments to better safeguard the funds, including the purchase of a new safe.

3. Again, for the purposes of this motion only, Columbia does not dispute this assertion.

On April 3, 2002, at the next staff meeting with his managers, Conlon advised them that there was a problem at the HS campus security office and that monies were missing from the safe. Conlon also asked Crews directly whether he had any ideas about the missing money. After the staff meeting, Crews admitted to Conlon that he had taken the money and promised to return it. Until then, Conlon believed Crews was a loyal, dedicated and honest employee.

On Monday, April 8, 2002, Crews met with Conlon and gave him $960 in cash, along with numerous empty parking envelopes that had previously contained parking money. All of the envelopes had been opened.

According to Columbia, Conlon informed Smartt of the theft and Crews' admission. Smartt told Conlon to terminate Crews' employment. Conlon convinced Smartt to delay his decision to allow Conlon the opportunity to work on a solution that would allow Crews to keep his job. According to Crews, an agreement was reached not to disclose the loss of the money and that Crews would keep his job.

Over the next several days, Conlon proposed several alternatives that were unacceptable to Smartt. Conlon then proposed that Crews be demoted, removing any responsibility concerning money. Conlon also proposed that Crews remain in his title but reduce his responsibilities, remove any responsibility concerning money and reduce his salary. Smartt considered these proposals as acceptable. Smartt knew that Conlon did not want to fire Crews. Smartt stated that against his better judgment, he did not consult with his directors about this situation, as was his usual practice in making decisions of this magnitude. According to Crews, those allegations are argument, self-serving and misleading.

Conlon had several discussions with Crews about the consequences of his theft. Conlon discussed demoting him or reducing the scope of his responsibilities and cutting his salary. Conlon also instructed Crews to reconcile his petty cash account and to catch up immediately on all his outstanding paperwork. According to Crews, these discussions resulted from his complaints about discrimination unrelated to taking the money.

On May 5, 2002, after Conlon returned from vacation, he provided Crews with memoranda detailing the reductions and changes in his responsibilities and assignments and emphasizing Conlon's intention to more intensively supervise and review his work. Crews admitted that the May 5, 2002 memorandum he received reflected the modifications in his responsibilities that Conlon told him were conditions of his continued employment in the Department. According to Columbia, Crews also acknowledged that he was advised to keep the agreed resolution of his theft confidential because if his theft became known, he would not be able to function in the Department. Crews has asserted these allegations are argument, self-serving and misleading.

Although a reduction in Crews' salary was discussed and was included in the May 5, 2002 memorandum, a salary reduction was not put into effect. Crews did not actually receive less pay at any time prior to his termination nor did his position change in any material respect. Crews also stated that his access to money was not taken away because he kept the key to the petty cash safe, but he admitted not opening the petty cash box and not knowing how much money was contained therein, despite his sole control over the funds. Crews testified that Conlon took his petty cash receipts and that he kept the receipts in the locked petty cash box with the

vouchers and he was the only person with the key. According to Crews, Conlon testified that there was no discrepancy in the petty cash funds.

On or about May 9, 2002, Crews complained to Finnegan that Conlon was harassing him. Crews testified that Conlon was "in [his] office everyday and giving [him] additional work, coming to check on [his] work, telling [him] we're not going to go to lunch, we're not going to go home ... [He] was used to being a worker, not someone being put in a corner and being treated like a little child." He described the harassment as "increased workload, unnecessary work assignments and false memos being submitted" and testified that the meaning of his allegation was that his job responsibilities were reduced. Crews did not state to Finnegan any reason that Conlon was supervising him more closely and requiring him to address all his paperwork responsibilities. He did not include a complaint regarding gender discrimination. Finnegan testified that Crews did not complain about gender discrimination to him. According to Crews, he included a complaint of gender discrimination.

Believing that a demotion or reduction in Crews' responsibilities was being considered or implemented, Finnegan approached Smartt on Crews' behalf. It was apparent to Smartt that Finnegan did not know why Conlon had reduced Crews' job responsibilities or why he was supervising him more closely than in the past. Smartt scheduled a meeting with all his directors for the next morning to advise them about the theft. According to Crews, these allegations are argument and self-serving.

On May 10, 2002, Smartt held a directors' meeting and advised Finnegan and Murolo that Crews stole money from the University. Both Finnegan and Murolo insisted that Crews' employment be terminated immediately. Despite his earlier decision allowing Crews to remain employed, Smartt agreed that Crews should be discharged. Smartt instructed Conlon to terminate Crews' employment. Following the meeting, Conlon met with Crews and suspended him pending his termination. According to Crews, he was discharged because of his complaints of gender discrimination.

Crews spoke with Smartt after he was suspended. Smartt offered Crews the opportunity to resign or to accept a transfer to another department. Crews testified that Smartt offered him the opportunity to resign, but acknowledged that termination would enable Crews to receive unemployment insurance. Crews also has contended that his complaints to Smartt concerning Conlon's alleged harassment were the cause of the changes in his responsibilities detailed in the May 5, 2002 memoranda.

On May 14, 2002, Conlon met with Crews and advised him that his employment was terminated, that additional questions had been raised about monies that were missing, and that he was concerned that Crews had not reconciled his petty cash account. Crews said nothing while Conlon explained the reasons for his termination, but now has asserted that he was discharged because of his complaints of gender discrimination.

On May 19, 2002, Conlon sent Crews a letter that provided all the reasons for his termination that he previously explained during their meeting on May 14, 2002. Crews has asserted the letter was not received until June and contained inconsistencies.

Crews has claimed his termination was pretextual and retaliatory because he believed the issues concerning his taking the money had been "resolved" "several weeks prior to the date of his discharge." (Compl.¶ 12). Crews testified that if he

committed a crime it should have been investigated by Finnegan, the Assistant Director of Investigations according to the procedure, and suggested that he was treated differently because Conlon investigated him rather than Finnegan. He testified, however, that if Finnegan had found probable cause to believe he had done anything wrong, he would have been terminated immediately, and that he was not aware of any other manager of the Department of Security who committed a crime.

According to Columbia, Crews' termination on May 14, 2002 was a direct consequence of his theft of Columbia funds for which he was directly responsible and was not a pretext for gender discrimination nor was it retaliatory for his alleged complaints about gender discrimination. Crews has asserted that this allegation is argument.

According to Columbia, in July 2002, the New Assistant Director, Jennette, was hired. She was formerly a commanding officer in the NYPD. According to Crews, she was interviewed on July 17, 2002 and hired on August 27, 2002.

The hiring and recruitment process was similar to that previously described for Griffin. According to Crews, this allegation is irrelevant.

According to Columbia, the persons Columbia interviewed for the Assistant Director position, on both occasions when applicants were being sought, had qualifications objectively superior to those of Crews. A comparison of Crews' experience and qualifications with those required for the position and with those of candidates interviewed demonstrates that Crews did not meet the minimum requirements for the position and the applicants the Department considered did. Griffin's qualifications contained in her resume were objectively superior to those of Crews. Jeannette's qualifications were also objectively superior to those of Crews. According to Crews, this allegation is irrelevant.

In September 2003, Crews was arrested for bank robbery after he led police on a high-speed car chase through the streets of upper-Manhattan, fleeing from the bank he had just robbed. Following his arrest, he confessed to an earlier bank robbery he committed in August. He was indicted for two counts of bank robbery and possession of a loaded handgun, pleaded guilty and was sentenced to two 15–year sentences to run consecutively. Crews is incarcerated in a federal correctional facility in Lorretto, Pennsylvania, serving his sentence.

***Standard For Summary Judgment***

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000).

The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of

proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir. 1985). However, the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there is not, summary judgment is proper. *Id.* at 249–50, 106 S.Ct. 2505.

In a case wherein the plaintiff asserts that the employer's decision was a pretext for discrimination, courts use the well known *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 793, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1973). First, the plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination. *Texas Dep't of Comty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207, (1981); *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817; *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000). Only if the plaintiff meets this initial burden will the burden then shift to the defendant to produce evidence that the adverse employment action was taken for some legitimate non-discriminatory reason. *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089. If the defendant articulates a legitimate non-discriminatory reason for its action, "the presumption raised by the *prima facie* case is rebutted, and drops from the case." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407, (1993) (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089). Then, the plaintiff has the ultimate burden to demonstrate by a preponderance of the evidence that the articulated reason offered by the defendant for the adverse employment action is merely a pretext for actual discrimination. *Mandell v. County of Suffolk,* 316 F.3d 368, 380–81 (2d Cir.2003).

Mixed-motive cases require a similar burden-shifting approach but the triggering factors to shift the evidentiary burdens are different. To establish a *prima facie* case under a mixed-motive analysis, the plaintiff must submit direct evidence that an illegitimate factor motivated or played a substantial role in the employer's decision. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *see* 42 U.S.C. § 2000e–2(m); *see also Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997) (discussing the meaning of "direct" evidence); *Ostrowski v. Atlantic Mut. Ins.,* 968 F.2d 171, 182 (2d Cir.1992) (same). If the plaintiff can provide this evidence, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision for a permissible reason. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 93, 123 S.Ct. 2148, 156 L.Ed.2d 84, (2003); *Price Waterhouse,* 490 U.S. at 244, 109 S.Ct. 1775; *Raskin,* 125 F.3d at 60.

Because the plaintiff's burden of establishing a *prima facie* case is greater under the mixed-motive approach than under the *McDonnell Douglas* framework, if the plaintiff fails to produce evidence creating an inference of discrimination, a mixed-motive approach is of no avail to the plaintiff on summary judgment. *See Abbondanzo v. Health Mgmt. Sys., Inc.,* No. 00 Civ. 4353, 2001 WL 1297808, at *6 (S.D.N.Y. Oct.25, 2001) (discussing differences between single motive and mixed-motive cases). Accordingly, if the plaintiff fails on the *McDonnell Douglas* analysis,

he necessarily fails under the mixed-motive analysis. *Berkowitz v. County of Orange,* 120 F.Supp.2d 386, 400 (S.D.N.Y. 2000).

The question for the court on summary judgment remains the same—whether the plaintiff's evidence, taken as a whole, establishes a substantial evidence that the employer intentionally discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000); *see also Moorehead v. New York City Transit Auth.,* 385 F.Supp.2d 248, 253–54 (S.D.N.Y.2005) (assuming a *prima facie* case and proceeding directly to the "ultimate issue"); *Jalal v. Columbia Univ.,* 4 F.Supp.2d 224, 234 (S.D.N.Y.1998) (declining to "dance mechanistically through the *McDonnell Douglas* and *Price Waterhouse* 'minuets'" and proceeding directly to the ultimate issue).

***Crews Has Failed To Establish A Prima Facie Case Of Discriminatory Termination***

To establish a *prima facie* case of discriminatory termination the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for his position or performing his job satisfactorily; (3) he was discharged; and (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his gender. *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003); *Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 767 (2d Cir.2002). This burden at the *prima facie* stage often is described as *de minimis. See, e.g., Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001). It is not, however, nonexistent. If the plaintiff fails to establish any element of his *prima facie* case, summary judgment is appropriate. *Williams v. R.H. Donnelley Corp.,* 368 F.3d 123, 126–27 (2d Cir.2004).

Prior to his admission of theft, Crews was a valued member of the Department of Security and was entrusted to protect the property of Columbia, including the funds he stole. Crews' admission necessarily changed that assessment. "Satisfactory performance" by definition does not include theft.

Crews has failed to proffer sufficient evidence that the circumstances of his termination create an inference of gender discrimination. Upon learning of Crews' theft, Smartt stated that he should be discharged. Conlon persuaded Smartt to allow Crews to remain employed under certain conditions. Crews admits that the May 5, 2002 memorandum articulated the conditions of his continued employment and that Smartt, Conlon and he agreed to keep his theft and the resulting charges in his responsibilities confidential.

Although Smartt initially was persuaded to allow Crews to remain employed, he reconsidered the merits of his decision when he realized that keeping his other directors in the dark about the theft was a mistake. Upon informing all his directors of Crews' confession, both Finnegan and Murolo demanded that Crews' employment be terminated. Both Smartt and Conlon agreed that termination was the only realistic and appropriate course of action.

Whether the initial decision to keep the theft confidential was a good business decision or not, it created no inference of discrimination or retaliation on the basis of gender. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 315 (2d Cir.1997) (courts should not act as super-personnel departments, reexamining entities' business decisions). Further, the circumstances prompting Smartt to advise his other directors of the theft, and Smartt's

ultimate decision to terminate Crews' employment, do not suggest discrimination or retaliation on the basis of gender. *See Francis v. Runyon,* 928 F.Supp. 195, 203 (E.D.N.Y.1996) (courts should not second-guess employers' judgment as long as they are not made for discriminatory reasons).

***Crews Has Failed To Establish A Prima Facie Case of Retaliatory Termination***

A viable claim for retaliatory termination requires the plaintiff to show: (1) his participation in a protected activity known to the defendant; (2) his discharge; and (3) a causal connection between the protected activity and his termination, *i.e.,* that a retaliatory motive played a part in the termination decision. *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004).[4]

Crews fails to proffer any evidence establishing the third element of his *prima facie* case, a causal connection between his complaint of gender discrimination and his termination. "A causal connection may be established either *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001).

Crews has alleged that he complained about women getting promoted "over" him after Compel was transferred to HS, and he returned to Morningside. He has failed to connect his complaint of gender discrimination to his discharge some two and a half months later. Because Crews has failed to establish a jury question regarding a causal connection between his termination and his complaints, summary judgment is appropriate. *See Carrion v. Local 32B–32J Serv. Employees Int'l. Union, AFL–CIO,* No. 03 Civ. 1896, 2005 WL 659321, at *17 (S.D.N.Y. Mar. 21, 2005) (summary judgment granted where plaintiff failed to establish *prima facie* claim of retaliatory discharge); *Khan v. Abercrombie & Fitch, Inc.,* No. 01 Civ. 6163, 2003 WL 22149527, at *9 (S.D.N.Y. Sept. 17, 2003) (same).

Crews has also attributed a retaliatory motive to Conlon, the one person who continued to argue against his discharge. Smartt testified that when Crews complained about Conlon's harassment, Smartt advised him he was wrong about Conlon and that Conlon had been the one person who wanted Crews to keep his job. Crews' termination directly followed his complaints to Finnegan about Conlon's "micromanaging" his work, and Smartt's disclosure of his theft to Finnegan and Murolo. No evidence has been submitted other than Crews' assumption linking his discharge to any prior complaints about Griffin's hiring.

***The Termination Was Not Pretextual***

Even assuming a *prima facie* case of discriminatory or retaliatory termination, Columbia produced a legitimate nondiscriminatory reason for Crews' termination, namely his admitted theft. *See, e.g., Burch v. Roswell Park Cancer Inst.,* No. 03 Civ. 0473, 2005 WL 106594, at *6 (W.D.N.Y. Jan. 18, 2005) (Theft is a legitimate, nondiscriminatory reason to discharge an employee); *Sergilus v. Covenant House Under 21,* 1999 WL 717274, at *1–2, 1999 U.S. Dist. LEXIS 14254, at *3 (S.D.N.Y. Sept. 15, 1999) (same); *Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, 489 (S.D.N.Y.1998) (same).

4. Crews' state and city law retaliation claims are analyzed in tandem with his Title VII retaliation claim. *McMenemy v. City of Rochester,* 241 F.3d 279, 283 n. 1 (2d Cir.2001).

Here, Crews has failed to provide sufficient evidence to allow a rational fact-finder to infer that Columbia's reasons for terminating him were pretextual and that the real reason for his discharge was discrimination. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir.2000) (granting summary judgment where plaintiff failed to establish pretext); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000) (same).

Crews has admitted that discussions regarding the consequences of his theft were ongoing between himself and Conlon from April 8, 2002 until Conlon returned from vacation, culminating in his receipt of the May 5, 2002 memorandum detailing the changes in Crews' responsibilities. Crews has stated that he was angry about the changes and that less than a week after they were imposed he complained about them to Finnegan, and that Conlon told him that his complaints to Finnegan precipitated Smartt's disclosure of the theft.

Crews' reliance on *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 n. 4 (2d Cir.1999), to negate the absence of retaliatory motive is unavailing. The court noted in *Danzer* that an employer's "collateral, commendable" behavior is not an absolute shield to liability under the ADEA. Here, Conlon's attempts to persuade Smartt and thereafter Finnegan and Murolo, to continue Crews' employment despite his theft are not collateral. Conlon's actions and discussions with others, actions that were unknown to Crews, negate the inference that gender or complaints of gender discrimination entered into the decision to terminate him.

Crews has failed to provide sufficient evidence to allow a rational fact-finder to infer that Columbia's reasons for terminating him were pretextual and that the real reason for his discharge was discrimination. Failing to establish pretext, summary judgment is appropriate. *See, e.g., Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir.2000) (granting summary judgment where plaintiff failed to establish pretext).

***The Failure To Promote Claims Are Dismissed***

Crews has alleged that he applied for but was not promoted to the position of Assistant Director on the basis of gender and that Griffin, a woman, was hired instead of him. (Compl.¶ 16). He has also alleged that he reapplied for the position of Assistant Director when it next became available, was designated Acting Assistant Director, but subsequently was "demoted" and Compel, a female, was "promoted" to the position "over" him because she was a woman. (Compl.¶ 19).

A Title VII claim must be filed with the EEOC within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e–5(e)(1). A failure to promote claim is a discrete act and "constitutes a separate actionable 'unlawful employment practice.' " *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106, (2002). The statute of limitations begins to run from the date the employee is notified of the employer's decision. *Del. State Coll. v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431, (1980).

Crews filed his charge of discrimination with the NYSDHR on September 23, 2002. He thus can sue only for denials of promotions occurring after November 28, 2001.[5] Griffin was selected as the new

5. The New York Human Rights Law has a three-year statute of limitations. N.Y.C.P.L.R. § 214; *Patrowich v. Chemical Bank,* 98 A.D.2d 318, 324, 470 N.Y.S.2d 599 (1st Dep't 1984), *aff'd on other grounds,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984). It

Assistant Director for HS after her last interview on or about June 26, 2001. (Compl.¶ 16). Griffin started working for Columbia on July 23, 2001. Crews admitted that in June 2001 he knew Griffin would be hired for the position he allegedly sought. (Compl.¶ 16). His cause of action began to accrue from that date. Accordingly, his first failure to promote a claim is time-barred under Title VII.

To establish a *prima facie* claim of failure to promote on the basis of gender, Crews must establish that (1) he was male; (2) he applied and was qualified for the position sought; (3) though qualified, he was rejected; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. *Petrosino v. Bell Atlantic,* 385 F.3d 210, 226 (2d Cir.2004).

Crucially, Crews must establish he met the qualifications described in position announcement. *Williams v. R.H. Donnelley Corp.,* 368 F.3d 123, 127 (2d Cir.2004); *Thornley v. Penton Publ'g, Inc.,* 104 F.3d 26, 29 (2d Cir.1997). Further, the Second Circuit states that employers' decisions regarding the value placed on particular experience or education when evaluating job applicants are not subject to judicial review. *Scaria v. Rubin,* 117 F.3d 652, 655 (2d Cir.1997).

Crews did not have a college education and did not make any effort to improve his formal education while he was an employee at Columbia. Crews also has not established that he possessed sufficient administrative skills or attention to detail. Crews also lacked sufficient law enforcement experience and the desired stature within the law enforcement community. One of Smartt's objectives was to ensure that both the Columbia community and the local law enforcement community respected his selection of Assistant Director to enable and facilitate effective interaction with both communities.

Crews has contended that he was qualified for the position of Assistant Director because he was transferred to the HS campus on two occasions to perform security duties and responsibilities and, on the second occasion, was given the title of Acting Assistant Director and that gender discrimination was the reason he was not promoted to this position.

Crews has conceded that he was assigned to the HS campus to fill the managerial void first created by the retirement of the operations manager for HS and then by Griffin's resignation. He further admits that his duties were the same as those he performed at Morningside, that he traveled back and forth until an Assistant Director for HS was hired, performing the same duties at each campus, that his official title never changed and his supervisor never changed.

When Crews returned to the HS campus after Griffin's resignation, he was designated Acting Assistant Director. Although an acting appointment that fills an actual vacancy may support a discriminatory promotion claim under certain circumstances, *see Petrosino v. Bell Atlantic,* 385

is within the discretion of the Court to resolve supplemental state claims on summary judgment, particularly where the court determines that interest of judicial economy are served because plaintiff's claims under state and city law are analyzed under the same standards as the Title VII claims and would result in dismissal as well. *See, e.g., Barriera v. Bankers Trust,* No. 98 Civ. 3641, 2003 WL 22387099, at *9 (S.D.N.Y. Oct.20, 2003) (exercising supplemental jurisdiction, dismissing state and city claims along with Title VII claims on summary judgment for reasons of judicial economy given identical analysis). Although plaintiff's first failure to promote claim is time barred under federal law, his first failure to promote claim is discussed nonetheless within the context of this motion.

F.3d 210, 229 (2d Cir.2004) (citing cases), Crews has admitted that the only difference in his responsibilities when he returned to the HS campus the second time was that he now had access to the safe and was responsible for securing the parking revenues for the Department. Because Crews assumed only those responsibilities of an Operations Manager, and the Directors resumed their senior management responsibilities, he did not actually fill the entire vacancy created by Griffin's departure. Accordingly, the scope of Crews' authority did not change because of either transfer.

Crews performed well in his position as manager of operations and received additional compensation. However, his opinion that he was qualified for a higher position within the Department is not controlling.

Although Crews may disagree with Columbia's determination that Griffin was more qualified than he, courts are not permitted to second-guess the reasonableness of the employer's criteria for employment or the merits of its selection for the position. *Orisek v. American Inst. Aeronautics and Astronautics,* 938 F.Supp. 185, 192 (S.D.N.Y.1996), *aff'd,* 162 F.3d 1148 (2d Cir.1998); *Thornley v. Penton Publ'g., Inc.,* 104 F.3d 26, 29 (2d Cir.1997). Whether Crews was qualified for the job must be judged by Columbia's standards, not his own. *Thornley,* 104 F.3d at 29.

Crews has not established that the persons Columbia interviewed for the position, on either occasion when applicants were being sought, had qualifications comparable to those of Plaintiff. A comparison of Crews' qualifications with those required for the position and with those of candidates considered conclusively demonstrates that he did not meet the requirements for the position and that the applicants the Department considered did.

Further, a comparison of the credentials of the candidates interviewed demonstrates that the minimum qualifications for the position were applied consistently with respect to each applicant interviewed. Each applicant interviewed had a college degree and in most instances a graduate degree. Each candidate was a member or former member of the NYPD with more than twenty years' experience in law enforcement, was an experienced administrator, almost all having budget responsibilities, and extensive supervisory experience. (Compl.¶¶ 63–65).

Crews has relied on several cases in an apparent effort to define as direct evidence of gender discrimination Smartt's statements. (*See* Pl. Mem. at 10). None, however, supports his argument that Smartt's statements constitute direct evidence of discriminatory animus on the basis of gender. For example, in *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379 (5th Cir. 2003), an age discrimination case, the court found that the decision-maker's stated preference to have "good long-term employees because it helped with consistency and quality of their work" was not direct evidence of age discrimination. The court explained that the statement would require a jury to infer that the employer's decision to layoff plaintiff, a 60–year–old likely to work only five to six more years, instead of a substantially younger employee, a 38–year–old likely to work about twenty more years, was evidence of age discrimination. *Id.* at 384 n. 3. Here, Smartt stated his hope that they could recruit qualified women to apply for the position but that they should hire the best person for the job.

Smartt was asked whether he gave Conlon, Finnegan or Murolo, the supervisors charged with recruiting and interviewing applicants, a directive to hire a woman. Smartt answered, "No." When asked why his name appeared under the interviewer

column on the applicant pool report, Smartt explained that he met each of the candidates and briefly spoke with each of them but that this interaction was not an interview. Smartt stated that Conlon, Finnegan, and Murolo had the authority to hire a candidate without Smartt's approval. Smartt further explained that though he could not recall an instance when he did not agree with a hiring decision, his management style was consultative and that most decisions were made by consensus.

Crews does not rebut the testimony of Conlon, Finnegan and Murolo, each of whom have stated that they were not directed by Smartt to hire a woman, and did not believe that they were required to hire a woman, or that Smartt's desire to recruit a qualified woman meant that they should exclude a qualified man.

Suggesting pretext, Crews has argued that the recruitment and application process for Assistant Director did not comport with Columbia's policies or practices. (*See* Pl. Mem. at 18–22). The record demonstrates otherwise. For example, a comparison of the applicant pool reports for Crews and Compel with that for Jennette reflects similar presentations to the monitoring committee, to whom these forms are submitted. The similarity between these reports negates the inference that the paperwork for the position at issue was handled differently than that for other positions within the Department.

Crews has suggested that the posting of the position in June 2001, after the interviews, is indicative of discrimination. Smartt testified as to the meaning of the note he dictated to the monitoring committee, namely to advise the monitoring committee that despite the time lag between postings, interviews for the position continued. The note also confirms that the position was posted previously but remained unfilled for a lengthy period of time. No evidence is presented suggesting that either the note to the monitoring committee or Smartt's explanation is contrary to Columbia policies and therefore a pretext for discrimination.

Although Crews has asserted that gender discrimination is evidenced by the Department's deviation from an alleged practice of promoting from within, he has failed to establish he was treated differently from the other internal candidate, Compel. Neither internal candidate, plaintiff, a male, nor Compel, a female, was hired for the position.

Finally, Crews has failed to establish that any alleged deviation in positing or advertising adversely affected him. As a member of the Department, he was aware of the availability of the positions available and did not rely on the posting or advertising of the position to apply. Accordingly, the timing, duration, manner or length of posting is of no consequence to Crews or to the determination that he was not qualified for the position and therefore not promoted.

"Congress did not intend by Title VII ... to guarantee a job to every person regardless of qualifications ... [T]he Act does not command that any person be hired simply because ... he is a member of a minority group." *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 28 L.Ed.2d 158, (1971).

Crews has failed to establish a discriminatory motive in the selection of Griffin and her ultimate successor.

***Crews Has Failed To Establish Pretext***

[redacted] Even assuming a *prima facie* case, Crews has presented no genuine issue of material fact through either direct or circumstantial evidence that Columbia's reasons for not promoting him were pretext and that it is more likely that a discriminatory reason motivated the decision

not to hire Crews. Crews bears the ultimate burden of persuasion on this issue. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000).

The difference between the quantum of proof necessary to establish a *prima facie* case and that necessary to defeat summary judgment is significant. A court must examine the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000); *Shah v. New York State Dep't of Civil Serv.*, No. 94 Civ. 9193, 1997 WL 769565, at *5 (S.D.N.Y. Dec. 10, 1997) (dismissing plaintiff's failure to hire claim because he failed to rebut defendant's legitimate reason for the decision). Crews' conclusory assertion that he was qualified for the position, which may or may not be sufficient to establish a *prima facie* case, is not sufficient to defeat summary judgment.

Crews has alleged that after he was reassigned to the HS campus a second time in December 2001, he was inexplicably "demoted" back to Operations Manager in March 2002, and Columbia "promoted" Compel, a woman to the position. (Compl.¶ 18).

However, Crews was not "promoted" to the position of Assistant Director. He was reassigned temporarily and on a part-time basis to the HS campus. The scope of his duties and responsibilities did not change; his title and position never changed. He simply performed his duties as Manager of Operations on two campuses rather than one. (Compl.¶¶ 24, 33–36).

In addition, Compel was not "promoted" to the position when she was transferred to the HS campus, allowing Crews to return to Morningside where he was needed. Compel's title did not change and she returned to her position as Training Manager when the Assistant Director was hired.

Crews has admitted that his transfer back to Morningside was at the request of his supervisor, and he has offered no evidence that his transfer back to Morningside on either occasion materially altered his job duties, criteria necessary to suggest that he was demoted. *See Milford v. New York City Bd. of Health,* No. 02 Civ. 2834, 03 Civ. 2765, 2005 WL 195561, at *4 (E.D.N.Y. Jan.27, 2005) (summary judgment granted where plaintiff failed to establish that involuntary transfers were adverse employment actions). Crews also failed to distinguish his transfer to and from HS with Compel's transfer to and from HS in his assertion of disparate treatment. *Id.* (plaintiff failed to create inference of discrimination because he failed to demonstrate employees not in the protected group were treated more favorably than plaintiff). Crews and Compel were treated in the same manner, each transferred on a temporary basis to the HS campus until the position of Assistant Director was filled.

A stated desire for diversity in the workplace does not establish evidence of discriminatory motive. *See Silver v. CUNY,* 947 F.2d 1021, 1022 (2d Cir.1991) (per curiam) (internal memorandum stating that list of candidates "should include a very significant representation of minorities and females" does not suggest that appointments should or would be race or gender based); *Blanke v. Rochester Tel. Corp.,* 36 F.Supp.2d 589, 598 (W.D.N.Y. 1999) (active recruitment of minority candidates when positions are open does not establish discriminatory animus against non-minority candidates); *Brown v. Time, Inc.,* No. 95 Civ. 10081, 1997 WL 231143, at *4 (S.D.N.Y. May 7, 1997) (company newsletter expressing desire to recruit, retain and promote minorities in order to

make diversity a reality, and statement by a decision-maker that a Black candidate was hired "because ... Time needed to have more minorities in upper management" did not suggest a policy of discrimination but rather expressed a commitment to diversity).

Here, four women were interviewed for the position the first time it was available and a woman was selected. Crews fails to offer any evidence that during the 18-month hiring period that the position remained open, qualified men applied and were not interviewed because of gender. Crews, without any evidence other than his own conclusory opinion, asserted that he was denied promotion because of his gender. *Moorehead v. New York City Transit Auth.*, 385 F.Supp.2d 248, 254 (S.D.N.Y.2005) (fact that 15 of 18 successful candidates were Asian may indicate preference; however, undisputed evidence established their qualifications and the plaintiff's lack of comparable experience). Crews lacked the specified education for the position and was advised of his deficiencies in areas significant to the position he sought. His supervisors did not consider him qualified for this particular position at this particular time. *Thornley,* 104 F.3d at 29 (the employer's standards control the hiring decision, not those of the plaintiff).

Even if it is assumed that Crews has presented sufficient evidence of discriminatory motive to trigger Columbia's burden to assert its affirmative defense, no reasonable trier of fact would conclude other than Columbia would have reached the same decision in the absence of any alleged impermissible motivation. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 93, 123 S.Ct. 2148, 156 L.Ed.2d 84, (2003); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 104 L.Ed.2d 268, (1989); *Tyler,* 958 F.2d at 1181; *Boise v. New York Univ.,* No. 00 Civ. 7844, 2003 WL 22390792 (S.D.N.Y. Oct.21, 2003) (summary judgment granted where employer "produced undisputed evidence it would have reached the same decision in the absence of any impermissible motivation."); *aff'd sub nom. Boise v. Boufford,* 121 Fed. Appx. 890 (2d Cir.2005) (unpublished opinion); *Rizzo v. Amerada Hess Corp.,* No. 99 Civ. 0168, 2000 WL 1887533, at *6 (N.D.N.Y. Dec.29, 2000) (employer entitled to summary judgment despite direct evidence of discrimination because plaintiff was not qualified for the position at issue).

The record here establishes that Crews was terminated because of his theft and was not promoted because he was not qualified.

***Crews Has Failed To Establish A Prima Facie Case Of Disparate Treatment Or Retaliation***

Finally, Crews has not shown that the reduction in his work responsibilities constituted disparate treatment or retaliation. To establish a *prima facie* case of disparate treatment based on gender, Crews must show: (1) he was treated differently, (2) from a person of another gender, (3) where the defendant intended to discriminate, and (4) where the defendant's intent to discriminate caused the difference in plaintiff's treatment. *Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004).

A *prima facie* claim of retaliation requires that Crews show: (1) he engaged in protected activity, (2) the employer was aware of this activity, (3) the employer took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action, *i.e.,* that a retaliatory motive played a part in the adverse employment action. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 79 (2d Cir.2001); *McMenemy v. City of Rochester,* 241 F.3d 279, 282–83 (2d

Cir.2001); *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998).

An "adverse employment action" is one that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)). Materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (quoting *Crady*, 993 F.2d at 136); *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir.2004). None of Crews' complaints meet this standard.

Crews has failed to establish that the tasks assigned to him were not otherwise his actual job responsibilities as stated in the May 5, 2002 memoranda or that the responsibilities he was relieved of were material to his job. Crews complained about doing paperwork and being micromanaged. These general complaints are neither material nor adverse employment events. His claim that the reductions in his job responsibilities were materially adverse employment actions fails as a matter of law. *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y.2001) ("a decrease in workload, without any formal demotion or reduction in pay, does not constitute an actionable adverse employment action."). Quite simply, not every action of an employer, viewed as unfavorable by an employee who has filed a charge of gender discrimination, becomes actionable under the rubic of disparate treatment or retaliation. *Phillips v. Bowen*, 278 F.3d 103, 117 (2d Cir.2002).

Crews has presented no evidence comparing his treatment with any similarly situated persons—let alone establish that he was treated differently from any female in general or any female manager in particular. *See Taylor v. Local 32E Serv. Employees Int'l Union*, 286 F.Supp.2d 246, 255 (S.D.N.Y.2003) (granting summary judgment where plaintiff presented no evidence that other employees who were not terminated were similarly situated), *aff'd*, 118 Fed.Appx. 526 (2d Cir.2004) (unpublished opinion); *Visco v. Comty. Health Plan*, 957 F.Supp. 381, 389 (N.D.N.Y.1997) (granting summary judgment despite plaintiff's denial that she engaged in the conduct that led to her termination; she could not show any similarly situated employees who were given more favorable treatment for the same alleged conduct); *Porras v. Montefiore Med. Ctr.*, 742 F.Supp. 120, 126 (S.D.N.Y.1990) (dismissing plaintiff's claim because she could not identify any employees with similar work records who were treated more favorably).

Crews has presented insufficient evidence that his treatment was the result of either gender discrimination or retaliation. The difference in treatment occurred months after he returned to Morningside and after he admitted he stole money from his employer. The change in his responsibilities and the increased supervision were conditions of his continued employment in the Department. Accordingly, summary judgment on this claim is proper.

### Conclusion

For the reasons set forth above, the motion of Columbia for summary judgment is granted and the complaint is dismissed.

Submit judgment on notice.

It is so ordered.